56 F.3d 1281
 SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF ALABAMA on
behalf of its members and on behalf of a state-wide class of
black voters; Reverend John L. Alford, individually and on
behalf of a class of black voters in the Fifteenth Circuit
and District of Montgomery County; Reverend Abraham Woods,
Jr., individually and on behalf of a class of black voters
in the Tenth Circuit and District of Jefferson County;
Reverend P.H. Lewis, individually and on behalf of a class
of black voters in the Thirteenth Circuit and District of
Mobile County; George W. Grayson, individually and on
behalf of a class of black voters in the Twenty-Third
Circuit; Charles Steele, Jr., individually and on behalf of
a class of black voters in the Sixth Circuit; Reverend John
Nettles, individually and on behalf of a class of black
voters in the Seventh Circuit; Pearlean S. Jackson,
individually and on behalf of a class of black voters in
the Twentieth Circuit; Reverend James Milton, individually
and on behalf of a class of black voters in the Fifth
Circuit; Jesse R. Williams, individually and on behalf of a
class of black voters in the Fourth Circuit; Edwin L. Moss,
individually and on behalf of a class of black voters in the
Fourth Circuit; Luther P. Carmichael, individually and on
behalf of a class of black voters in the Fourth Circuit;
Mary K. Stovall, individually and on behalf of a class of
black voters in the Twenty-Sixth Circuit and District of
Russell County; Arthur L. Sumbry, individually and on
behalf of a class of black voters in the Twenty-Sixth
Circuit and District of Russell County; Albert Turner,
individually and on behalf of a class of black voters in the
Fourth Circuit; J.S. Thomas, individually and on behalf of
a class of black voters in the Fourth Circuit; and Malcolm
R. Newman, individually and on behalf of a class of black
voters in the Twentieth Circuit, Plaintiffs-Appellants,
v.
Attorney General Jeff SESSIONS; Chief Justice Sonny
Hornsby; Secretary of State Billy Joe Camp; Walker Hobbie,
Jr., Probate Judge, Montgomery County; Mike Bolin, Probate
Judge, Jefferson County; George Reynolds, Probate Judge,
Jefferson County; David G. Lightsey, Probate Judge, Bibb
County; Arthur C. Murray, Probate Judge, Calhoun County;
Emerson W. Thompson, Probate Judge, Chambers County;
Phillip W. Jordan, Probate Judge, Cleburne County; John W.
Jones, Jr., Probate Judge, Dallas County; E. Riley Lucas,
Probate Judge, Hale County; J.T. Harpe, Probate Judge,
Henry County; Cletus Yomans, Probate Judge, Houston County;
Alphonso Menefee, Probate Judge, Macon County; Frank
Riddick, Probate Judge, Madison County; W.L. Noonan,
Probate Judge, Mobile County; Donald R. Cook, Probate
Judge, Perry County; Mack Diamond, Probate Judge, Randolph
County; Wallace K. Brown, Probate Judge, Russell County;
Donald Fox, Probate Judge, Tallapoosa County; W. Hardy
McCollum, Probate Judge, Tuscaloosa County; Jerry Boggan,
Probate Judge, Wilcox County, Defendants-Appellees.
 No. 92-6257.
 United States Court of Appeals,
Eleventh Circuit.
 June 14, 1995.
 
 J. Richard Cohen, Elizabeth Johnson, Montgomery, AL, for appellants.
 James C. Wood, Simon, Wood & Crane, Mobile, AL, Fournier J. Gale, III, Maynard, Cooper, Frierson & Gale, Birmingham, AL, David R. Boyd, Balch & Bingham, Susan E. Russ, Miller, Hamilton, Snider & Odom, Montgomery, AL, for Noonan.
 Michael J. Bowers, Atty. Gen., David Walbert, Atlanta, GA, for amicus, State of Georgia.
 On Appeal from the United States District Court for the Middle District of Alabama.
 Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH and BLACK, Circuit Judges.*
 TJOFLAT, Chief Judge:
 
 
 1
 Appellant Southern Christian Leadership Conference ("SCLC") and the individual appellants are the class representative of the black voters in Alabama.[1] They appeal the district court's decision, Southern Christian Leadership Conference ("SCLC") v. Evans, 785 F.Supp. 1469 (M.D.Ala.1992), reached following a bench trial, rejecting their claim that Alabama's system for electing circuit and district judges in ten of Alabama's judicial circuits affords the black voters in those circuits, on account of their race, "less opportunity ... to participate in the political process" than other members of the electorate are afforded in violation of section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973 (1988).[2]
 
 
 2
 The district court rejected appellants' claim on two grounds. First, appellants' opportunity to participate in the election of the judges in question is not being abridged on account of their race. Second, the remedies they seek are not feasible alternatives to the electoral systems presently in place. We affirm.
 
 I.
 A.
 
 3
 Alabama has a "unified judicial system" of trial and appellate courts. The trial courts of general jurisdiction are the circuit courts, and the district courts are courts of limited jurisdiction. Ala.Code Sec. 12-1-2 (1986). Currently there are forty judicial circuits in Alabama, each designated by a number; each circuit contains one or more counties. See id. Sec. 12-11-2 (Supp.1993).[3] There is a separate district court within each county.[4] Id. Sec. 12-12-1 (1986).
 
 
 4
 Appellants challenge the system for electing circuit judges in the following ten judicial circuits:
 
 
 5
 Fourth Circuit--Bibb, Dallas, Hale, Perry, and Wilcox Counties
 
 
 6
 Fifth Circuit--Chambers, Macon, Randolph, and Tallapoosa Counties
 
 Sixth Circuit--Tuscaloosa County
 
 7
 Seventh Circuit--Calhoun and Cleburne Counties
 
 Tenth Circuit--Jefferson County
 Thirteenth Circuit--Mobile County
 Fifteenth Circuit--Montgomery County
 
 8
 Twentieth Circuit--Henry and Houston Counties
 
 Twenty-Third Circuit--Madison County
 Twenty-Sixth Circuit--Russell County
 
 9
 The appellants also challenge the district court election systems in Jefferson, Mobile, Montgomery, and Russell Counties. The challenged circuits include a majority of the state's population and represent both urban and rural areas within Alabama. Basic demographic information about these circuits and districts[5] is summarized in the following chart.
 
 
 10
 Nine counties in Alabama have a black majority voting age population: Bullock, Dallas, Greene, Hale, Lowndes, Macon, Perry, Sumter, and Wilcox. These counties are currently grouped into five separate judicial circuits. Only one of the five circuits, the Seventeenth, has a black majority of the voting age population.[6]
 
 
 11
 Judicial elections in Alabama are partisan. See id. Sec. 17-7-1 (Supp.1993). Judges on Alabama's trial courts are elected at-large from their circuits or districts. Id. Sec. 17-2-2. One of the challenged circuits has twenty-four circuit judges while others have as few as two. Each county, however, has at least one district judge. Candidates for judicial office in circuits or districts with more than one judge must run for a particular position (a "post") on the ballot; this is known as a numbered place system.
 
 
 12
 The Governor has the authority to fill midterm judicial vacancies, such as those that occur when a sitting judge dies, resigns, retires, or is removed from office. Ala. Const. amend. 328, Sec. 6.14. This power of appointment is limited in four of the challenged circuits by judicial nominating commissions[7] that solicit candidates, review their credentials, and certify a list of names to the Governor. In all four of these circuits, the Governor must appoint one of the people from the list to the vacant position. These four circuits contain forty-five of the sixty-six challenged circuit judgeships.
 
 B.
 
 13
 Alabama's system of at-large election of circuit court judges dates from 1850 when article V, section 12 of Alabama's 1819 Constitution was amended to require the General Assembly to "provide by law for the election of judges of the Circuit Courts by the qualified electors of their circuits respectively." Ala. Const. amend. 3 (1850). The 1865 Constitution required that "judges of the circuit and probate courts, and of such other inferior courts as may be by law established, shall be elected by the qualified electors of the respective counties, cities, or districts for which such courts may be established." Ala. Const. art. VI, Sec. 11 (1865). Similar provisions were retained in the 1875 and 1901 Constitutions. See Ala. Const. art. VI, Sec. 12 (1875); Ala. Const. art. VI, Sec. 152 (1901). In 1973, Amendment 328, which is known as the Judicial Article, repealed article VI of the 1901 Constitution and provided that "[a]ll judges shall be elected by vote of the electors within the territorial jurisdiction of their respective courts." Ala. Const. amend. 328, Sec. 6.13 (1973).[8] It is section 6.13 that currently requires at-large elections of circuit and district judges.
 
 
 14
 Similarly, Alabama has a long history of employing a numbered place system. The State first enacted statewide legislation requiring the use of at-large numbered positions for the election of circuit judges in 1927. At that time, there were no black attorneys in Alabama, and blacks were largely disfranchised. The historical context of the 1927 law reveals that the measure was promoted by conservative elements within the Democratic Party who felt threatened by victories in the 1926 elections by rival Progressive/Prohibitionist/Ku Klux Klan factions. In 1961, the Alabama Legislature passed Act 221, which expanded the use of numbered places to elect all multimember offices. Because judges were already elected under an at-large numbered place system, Act 221 did not change the judicial electoral process. The Judicial Article and reform movement of the 1970s also did not attempt changes from a popularly elected judiciary. Moving toward an appointment system would have garnered opposition from many Alabamians and would have lead to the defeat of the Judicial Article because enactment required voter approval. SCLC v. Evans, 785 F.Supp. at 1490.
 
 C.
 
 15
 Judges must be licensed to practice law in Alabama. Ala. Const. amend. 328, Sec. 6.07. Records of the Alabama State Bar reflect the following about the admission of black lawyers to the state bar:
 
 CUMULATIVE ADMISSIONS INTO ALABAMA STATE BAR
 
 16
 Cumulative
 Year Number Admitted Total Admitted
 1927 0 0
 1937 1 1
 1938 1 2
 1947 1 3
 1948 2 5
 1950 1 6
 1951 2 8
 1953 2 10
 1954 1 11
 1957 1 12
 1958 3 15
 1959 2 17
 1960 1 18
 1961 1 19
 1966 1 20
 1967 1 21
 1968 2 23
 1971 2 25
 1972 3 28
 1973 7 35
 1974 7 42
 1975 10 52
 1976 13 65
 1977 10 75
 1978 5 80
 1979 17 97
 1980 10 107
 1981 15 122
 1982 28 150
 1983 7 157
 1984 20 177
 1985 7 184
 1986 8 192
 1987 15 207
 1988 22 229
 1989 26 255
 1990 19 274
 1991 21 295
----------
 
 
 17
 The records of the Alabama State Bar indicate the following about the race of active lawyers holding a regular license to practice law in the challenged circuits:
 
 ACTIVE LAWYERS BY CIRCUIT BY RACE
 
 18
 Circuit No. Black % Black No. White % White
 4th 15 16.3 77 83.7
 5th 13 14.6 76 85.4
 6th 12 3.3 357 96.7
 7th 6 4.1 140 95.9
 10th 105 3.5 2909 96.4
 13th 20 2.1 934 97.8
 15th 56 5.3 1003 94.7
 20th 5 3.4 142 96.6
 23rd 15 3.3 445 96.3
 26th 4 7.6 49 92.4
----------
 
 
 19
 Until the late 1960s, black students were not admitted to the only accredited law school at that time in Alabama, the University of Alabama School of Law; the first black law student did not graduate until 1972. In the 1950s, the Alabama State Bar openly supported segregation legislation. Several local, voluntary bar associations effectively excluded blacks from membership--one until 1975. Currently, however, the University of Alabama School of Law and the Cumberland School of Law, a private institution, routinely admit black students. The Alabama State Bar has organized efforts to increase the number of blacks on the bench--as recently as 1990, by creating a Task Force on Minority Participation and Opportunity.
 
 
 20
 The Alabama Democratic Conference ("ADC") is a statewide black political caucus that is an arm of the state Democratic Party. It has had success in recruiting black candidates and supporting their campaigns. The ADC has also been active in choosing among white judicial candidates and organizing support for its preferred candidates.[9]
 
 
 21
 Only one black candidate for the trial bench who was not an incumbent has prevailed in a judicial election contest in a majority white jurisdiction. In 1976, Ralph Cook won a primary election in the Bessemer division of Jefferson County and ran unopposed in the general election for a district court judgeship. Five other nonincumbents have run for judicial office in majority white jurisdictions and lost:
 
 1. Nathaniel Owens
 
 22
 In 1980, Nathaniel Owens was elected district judge in the 7th Circuit, defeating a white opponent. During his term on the district court, he unsuccessfully attempted to unseat a white incumbent circuit judge. He ran despite the discouragement of the black community. In 1986, Judge Owens ran unsuccessfully as a Republican for reelection to the district court. He did not garner the support of the black vote or of black political organizations, such as the ADC, which instead supported the white Democratic candidate.[10]
 
 2. Emory Anthony and Raymond Chambliss
 
 23
 In the 1988 general election for district court in Jefferson County, Emory Anthony and Raymond Chambliss, both black Democrats, were defeated by white Republicans. The election results were driven largely by partisan politics. The black Democratic judicial candidates each received approximately 24 percent of the white vote while Governor Michael Dukakis, the Democratic candidate for President, received only 17 percent of the white vote in Jefferson County. The top white Democratic vote-getter received less than 40 percent of the white vote in the circuit.
 
 3. Frankie Fields Smith
 
 24
 Frankie Fields Smith of the Thirteenth Circuit lost to a white candidate in the 1980 Mobile County district court primary election and to two white candidates in the 1986 Mobile County district court general election. In 1980, she was not rated as being well qualified by the bar[11] and got little support. In 1986, she was not the candidate preferred by black voters. She ran as an independent because she entered the race too late to qualify as a Democrat and, consequently, a substantial majority of black support went to the white Democratic candidate.
 
 4. Al Beckles
 
 25
 In the Twenty-Third Circuit, Madison County, there has been only one judicial election involving a black candidate. Al Beckles, a black lawyer, was defeated in the 1990 Democratic primary election for district judge by a former assistant district attorney, who was a lifelong resident with strong connections countywide. The campaign was not marred by racial passion; indeed, the ADC gave the white candidate its co-endorsement.
 
 
 26
 Alabama's first black circuit judge was appointed in 1979. Since 1865, there have been five black circuit judges--all of whom first obtained that office by appointment. A black district judge was first appointed in 1977 in majority black Macon County. There have been nine black district court judges--one was grandfathered into office, three were elected, and five initially took office by appointment.
 
 
 27
 Once appointed, black judges have in most instances retained their positions. Justice Oscar Adams, for example, who had been the first black person elected to statewide office in Alabama, was appointed by the Governor in 1980 to serve on the Supreme Court of Alabama. Justice Adams won reelection in statewide races against well-known white opponents in the 1982 Democratic primary, the 1982 primary runoff, and the 1988 general election.[12] The current black circuit judges, all of whom were appointed to the bench, have, with one exception, been reelected without opposition. Only Judge Ralph Cook had a contested reelection bid; he was opposed by a white candidate shortly after his appointment in 1981, and was victorious. Judge Cook had no opposition in the 1988 election. Justice Adams retired from the Alabama Supreme Court in 1993, two years before the end of his term; Judge Cook was appointed to replace him on the court.[13]
 
 II.
 A.
 
 28
 This action was filed on May 11, 1988. Appellants named as defendants the Alabama Attorney General, the Chief Justice of the Alabama Supreme Court, the Alabama Secretary of State, and the county probate judges who administer the electoral systems in question.[14] Appellants alleged that the numbered, at-large elections these systems employ minimize the black voters' opportunity to participate in the political process and to elect representatives of their choice, and thus dilute their voting strength in violation of section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973 (1988). Appellants also claimed that the judicial circuit boundary lines were drawn with the intent to fragment high concentrations of the black population, so that they could not elect blacks to office.[15]
 
 
 29
 To remedy this situation at the circuit court level, appellants sought an injunction that would realign the circuit boundaries and then divide the circuits into single or multimember electoral districts in a manner that would ensure that the black voters could elect candidates of their choice to office. To eliminate the vote dilution at the district court level, appellants asked the court to divide the four counties in question into districts, again to ensure the election of blacks to office.[16] Appellants acknowledged that, if implemented, these remedies would eliminate the linkage between the judge's territorial jurisdictions and their electorate and, moreover, would disfranchise the voters in their jurisdictions who reside outside the new electoral districts.
 
 
 30
 Appellees, in their answer, denied that the challenged election systems afford appellants less opportunity than other members of the electorate to participate in the political process and elect candidates of choice. Moreover, appellees contended that appellants' proposed remedies were unfeasible, given the State's legitimate interest in maintaining the linkage between a trial judge's jurisdiction and elective base and guaranteeing a pool of potential candidates large enough to give the voters a reasonable choice.
 
 B.
 
 31
 The district court tried this case, in December, 1991, in accordance with the teaching of Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), a section 2 challenge to North Carolina's multimember legislative district scheme. Gingles holds that, to obtain relief under section 2 of the Voting Rights Act, the plaintiffs must establish the following: First, the plaintiffs must show that an appropriate remedy can be fashioned. In Gingles, the remedy was the creation of single-member districts in which the minority group the plaintiffs represented would constitute a majority sufficient to elect representatives of their choice. Second, the plaintiffs must show that the minority voters around whom the district is to be drawn are "politically cohesive." Third, the plaintiffs must show repeated bloc voting by the white majority such that the white majority usually defeats the minorities' preferred candidate. Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67.
 
 
 32
 In ordering the proof, the district court initially focused on the third Gingles prong: "whether there is polarized voting so that minorities have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." SCLC v. Evans, 785 F.Supp. at 1472-73.[17] On this issue, both sides offered voluminous statistical evidence and expert testimony interpreting that evidence. The experts are veterans of voting rights litigation. The appellants relied on the testimony of Dr. Allan Lichtman, Professor of History at American University in Washington, D.C. The appellees offered the testimony of Dr. Ronald Weber, Professor of Government at the University of Wisconsin. The experts in this case used substantially the same techniques--ecological regression and extreme case analysis--that were approved and utilized by the Supreme Court in Gingles. See Gingles, 478 U.S. at 61, 106 S.Ct. at 2772. Although the experts used the same or similar techniques, they differed sharply over which elections should be analyzed to determine whether voting has been and continues to be racially polarized.
 
 
 33
 Dr. Lichtman studied elections in which black candidates competed against white candidates and did not confine his analysis to judicial elections. He analyzed approximately 300 elections of twenty different offices over a ten-year period. Dr. Lichtman's conclusions are summarized below:
 
 
 34
 BLACK COHESION AND WHITE CROSSOVER: 1980S ELECTIONS
 
 
 35
 Circuit Black Cohesion % White Crossover %
 4th 85 15
 5th 74 21
 6th 76 20
 7th 79 25
 10th 88 22
 13th 77 20
 15th 70 22
 20th 73 20
 23rd 84 22
 26th 73 16
----------
 
 
 36
 Dr. Weber, however, declined to limit his analysis to campaigns in which black candidates participated. He analyzed all judicial elections, even those in which only white candidates participated, beginning his analysis in 1976 with the first elections following the enactment of the Judicial Article. Of the 353 judicial elections analyzed by Dr. Weber, 43 (12 percent) involved black candidates. Thirty of the 43 involved Oscar Adams.[18] Dr. Weber essentially found that in 76 percent of circuit judge elections and 77 percent of district court elections the candidate preferred by black voters won.[19] In statewide judicial elections, Dr. Weber concluded the candidate preferred by black voters won 83 percent of the elections.
 
 C.
 
 37
 After weighing all of the evidence, the district court concluded that appellants had failed to satisfy the third prong of the Gingles test and thus to establish a violation of section 2. Specifically, appellants failed to show that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." SCLC v. Evans, 785 F.Supp. at 1473. The court found that "for many years there has been no impediment to black voting in Alabama"; that "blacks and whites are registered in comparable percentages"; that "the black minority ... has had increasing political impact in all political contests"; and that "blacks have been largely successful in having the candidate of their choice win in contested judicial elections." Id. at 1486-87. In the court's view, "[n]o one could find that election schemes in Alabama have reduced the minority vote to an empty formality or prevented minorities from substantially influencing election outcomes.... [T]he black electorate is decisive in 'influencing the outcome' of elections and having their preferred candidate elected. This is a great credit to the sagacity of the black political leadership in Alabama." Id. at 1487.
 
 
 38
 Turning to appellants' claim that the judicial circuit boundary lines had been drawn with the intent to dilute their voting strength, the district court observed that appellants "offered no evidence that the at-large voting system for electing judges was racially motivated." Id. at 1488 n. 3.[20] On the evidence that was before it, the court found that "Alabama's procedure for electing judges at large (one hundred forty-two years) and for numbered places (sixty-five years)" and "the size of judicial circuits and districts were established with no racial discriminatory intent." Id. at 1487. In sum, the court found "no discriminatory purpose in the at-large voting system." Id. at 1488 n. 3.
 
 
 39
 The district court also concluded that the remedies appellants proposed are not feasible alternatives to the electoral systems now in place. The court advanced several reasons for its conclusion. For example, Alabama has "a legitimate state interest in having a judge's jurisdiction correspond to his constituency," id. at 1487; appellants' districting remedies would destroy this linkage and effectively disfranchise the voters residing beyond the judge's district. Appellants' influence in elections outside their district would diminish. " '[T]he great majority ... of judges [would] be elected from new voting subdistricts with negligible minority populations and, consequently, negligible minority political influence on the outcome of those elections.' " Id. at 1479 (quoting League of United Latin American Citizens Council v. Clements, 914 F.2d 620, 649-50 (5th Cir.1990) (en banc)).
 
 
 40
 Appellants' proposals would eliminate the numbered place system and force judges to run against one another. In the court's view, "a worse system could not be imagined." Id. at 1490.
 
 
 41
 [I]t is difficult ... to conceive of a more inefficient and damaging way of electing judges than to have them all run in competition with each other.... There is a problem now of getting the best qualified lawyers to seek judgeships. This problem would be compounded if potential judicial candidates realized that at election time all judges would have as opponents their colleagues on the bench. Such a system would hardly tend to cause harmonious collegiality on the bench, and the heightened probability that one would have the costly task of running for reelection at the conclusion of each term would make seeking judicial office substantially less attractive.
 
 
 42
 Id. at 1477.
 
 
 43
 The district court's decision rejecting appellants' claims issued on March 18, 1992. A panel of this court subsequently vacated that decision and remanded the case for reconsideration in light of Nipper v. Smith, 1 F.3d 1171 (11th Cir.1993). After we took Nipper en banc, Nipper v. Smith, 17 F.3d 1352 (11th Cir.1994), we granted rehearing en banc and vacated the panel opinion in this case. SCLC v. Evans, 18 F.3d 897 (11th Cir.1994).
 
 III.
 
 44
 Appellants contend that the district court's finding that the challenged electoral systems do not afford them less opportunity than other members of the electorate to participate in the political process and to elect candidates of choice is clearly erroneous. According to appellants, the district court should have found to the contrary as a matter of law. Appellants also contend that the court erred in concluding that the remedies they proposed were unfeasible. Appellants, therefore, ask that we vacate the district court's judgment and remand the case for the imposition of the injunctive relief they are seeking. We consider these issues in turn.
 
 A.
 
 45
 We review the district court's findings of fact under the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. Gingles, 478 U.S. at 79, 106 S.Ct. at 2781. The only finding of fact appellants challenge in this appeal is the district court's finding on the ultimate factual issue: whether appellants' voting strength is being diluted on account of appellants' race. Appellants do not question any of the district court's findings on the subsidiary issues of historical fact.[21]
 
 
 46
 As noted supra, the district court, focusing on the third prong of the Gingles test, asked whether the voting patterns in the challenged jurisdictions reflected "polarized voting so that minorities have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." SCLC v. Evans, 785 F.Supp. at 1472-73. Specifically, the court asked whether whites and blacks voted for a judicial candidate on account of the candidate's race or for some other reason, such as the candidate's qualifications, political affiliation, or whether the candidate had received any endorsements. In considering the evidence on this issue and the relative weight it should be given, the district court undertook the requisite practical, searching inquiry required in section 2 cases. Gingles, 478 U.S. at 45, 106 S.Ct. at 2764. The court appropriately considered all of the circumstantial evidence--both statistical and anecdotal--that was offered.
 
 
 47
 We begin our assessment of the district court's finding on the ultimate issue by noting that there was no evidence that the at-large, majority vote, and numbered place requirements were instituted or are being maintained for discriminatory purposes, to dilute the appellants' voting strength on account of race. In addition, there was no evidence that the size of the judicial districts and circuits were established or are being maintained with such discriminatory intent. The appellants, therefore, have been basing their case for injunctive relief on the contention that, unless the challenged electoral systems are changed, vote dilution, given past voting patterns, will likely occur in the future.
 
 
 48
 Appellants contend that the district court's finding on the ultimate factual issue must be set aside because the court erred in its treatment of Dr. Lichtman's testimony. In its dispositive memorandum opinion, the court found Dr. Lichtman's analysis to be flawed. SCLC v. Evans, 785 F.Supp. at 1474-75. Dr. Lichtman's analysis was flawed because he only analyzed elections (both judicial and nonjudicial) involving a black candidate; moreover, he failed to appropriately consider the effect on judicial election results of the power of incumbency and, with respect to incumbents who had been appointed to office, the prestige of merit selection.[22] Id.
 
 
 49
 The district court correctly acknowledged this analytical omission: Lumping together all elections, judicial and nonjudicial alike, creates a risk of glossing over the significant differences between the legislative and judicial arenas. This is not to say that the approach of the appellees' expert, which only included judicial elections, was more appropriate. The district court also perceived flaws in Dr. Weber's analysis. Dr. Weber's analysis omits many nonjudicial electoral races in which black candidates participated; such races are certainly relevant to the inquiry the district court was conducting.
 
 
 50
 Although it was urged to do so by the respective experts, the court refused to ignore relevant evidence. In the district court's view, any evidence that explained election results was relevant. That is, the court considered both nonjudicial and judicial elections, elections involving a black candidate, and elections in which no black candidate ran, all the while being mindful of the differences between these types of elections. The court also took into account the contextual materials offered. For example, the court reviewed evidence concerning, among other things, the extent of past official discrimination in Alabama, the lingering socioeconomic effects of that discrimination, and the extent to which the black community has been able to organize into an influential and successful political force. The court made clear that it discounted what were, in effect, arguments offered by the experts, albeit in the form of "opinions," as to how the court should resolve the ultimate fact to be decided in the case: whether the voting strength of minority voters is being diluted on account of their race.[23] Although the court may have rejected these "opinions," as it was permitted to do, the court emphasized that it was not ignoring any of the relevant, circumstantial evidence--both testimonial and documentary--presented. The court concluded that "greater weight should be given to judicial elections ... and white on black judicial elections, but [that it would] also consider political races generally--white on black and white on white--in seeking to determine the question of whether the political process is open to minority voters." Id. at 1473 (citations omitted).
 
 
 51
 In sum, the district court engaged in a searching and meaningful evaluation of all the relevant evidence concerning the challenged trial court jurisdictions. As the court's dispositive memorandum opinion details, there was ample evidence in the record to support the court's conclusion that factors other than race, such as party politics and availability of qualified candidates, were driving the election results and that racially polarized voting did not leave minorities with "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Id. We find no cause to set aside the district court's finding on the ultimate issue of fact in this case. Appellants' claim under section 2 of the Voting Rights Act therefore fails.
 
 B.
 
 52
 We read as an alternative holding the district court's discussion of the appropriateness and feasibility of appellants' proposed remedies. We agree with the court's conclusion that, assuming that appellants' opportunity to participate in the challenged elections was being abridged, no remedy is available in this case. When determining whether the remedy a plaintiff seeks is a feasible alternative to the challenged electoral system, a state's interest in maintaining the challenged system is a legitimate factor to be considered. Houston Lawyers' Ass'n v. Attorney Gen., 501 U.S. 419, 426-27, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991) (citing Zimmer v. McKeithen, 485 F.2d 1297, 1305 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish Sch. Bd. v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)). The challenged system fosters several legitimate state policies; two of them in particular appear to dominate the analysis: (1) maintaining the link between a trial judge's jurisdiction and elective base; and (2) ensuring that a pool of potential judicial candidates is large enough to give the voters a reasonable choice. Accordingly, we address each of appellants' proposed remedies in light of the policies that the state's interests advance.
 
 1.
 
 53
 The first remedial option suggested by appellants is a reconfiguration of certain circuits. As we note supra, appellants presented no evidence indicating that the current circuit configuration was racially inspired. Under the proposed plan, five counties would be shifted into alternative circuits as follows:
 
 
 54
 REAPPORTIONMENT PLAN: CURRENT CIRCUIT DATA
 Current Total Black % %
 Circuits Pop. Pop. Black Black VAP
 Second
 Butler 21,892 8,798 40 35
 Crenshaw 13,635 3,544 26 24
 Lowndes 12,658 9,456 75 70
 48,185 21,798 45 40
 Third
 Barbour 25,417 11,194 44 40
 Bullock 11,042 7,986 72 67
 36,459 19,180 53 48
 Fourth
 Bibb 16,576 3,478 21 18
 Dallas 48,130 27,825 58 53
 Hale 15,498 9,214 59 55
 Perry 12,759 8,219 64 57
 Wilcox 13,568 9,353 69 63
 106,531 58,089 55 49
 Fifth
 Chambers 36,876 13,221 36 32
 Macon 24,928 21,340 86 84
 Randolph 19,881 4,686 24 21
 Tallapoosa 38,826 10,212 26 23
 120,511 49,459 41 38
 Current Total Black % %
 Circuits Pop. Pop. Black Black VAP
Thirty-Fifth
 Conecuh 14,054 5,925 42 38
 Monroe 23,968 9,372 39 35
 38,022 15,297 40 36
 REAPPORTIONMENT PLAN: PROPOSED CIRCUIT DATA
 Proposed Total Black % %
 Circuits Pop. Pop. Black Black VAP
 Third
 Barbour 25,417 11,194 44 40
 Bullock 11,042 7,986 72 67
 Macon 24,928 21,340 86 84
 61,387 40,520 66 63
 Fourth
 Dallas 48,130 27,825 58 53
 Hale 15,498 9,214 59 55
 Perry 12,759 8,219 64 57
 76,387 45,258 59 54
Thirty-Fifth
 Lowndes 12,658 9,456 75 70
 Monroe 23,968 9,372 39 35
 Wilcox 13,568 9,353 69 63
 50,194 28,181 56 51
--------
 
 
 55
 Caseload, population, population density, square miles per judge, attorneys per judge and other factors contribute to the allocation of judicial resources. Therefore, the reallocation of counties among circuits would have ramifications across the state. For example, Bibb County, which is currently one of five counties in the Fourth Circuit, would become a single county circuit. Whether a county of 16,576 could reasonably and efficiently support its own circuit is uncertain.
 
 
 56
 Bibb County also exemplifies the disfranchisement that would occur under the proposed reconfiguration: In the majority white circuits, the voting power of blacks would be diluted to a degree greater than the dilution alleged to be presently existing; in the majority black circuits, the voting power of whites would be diluted. Although currently the overall percentage of the black population of Bibb County is 21 percent, with a black voting age population of 18 percent; the black population of the Fourth Circuit in its entirety is 55 percent, with a black voting age population of 49 percent. Recircuiting would drastically dilute the vote of the black voters in Bibb County in circuit judge elections--from 49 percent of the voting age population to 18 percent.
 
 
 57
 There was no evidence that justice in the challenged courts is being administered in a racially discriminatory manner. The purpose to be served by reconfiguring the circuits, therefore, would be, for the most part, to assist in the election of black judges. But the effect of having black judges accountable primarily to the black section of the circuit, and white judges answerable to the white section of the circuit (as would happen in Bibb County, for example), would threaten the administration of justice--race would become the linchpin of the judicial system. Massive restructuring for the purpose of earmarking judgeships would undermine the existing public confidence in judges as fair and impartial decisionmakers.
 
 
 58
 Given the appellants' suggested plan, it is quite doubtful whether the goal of placing more black lawyers on the bench would be achieved. Two of the proposed majority black circuits would have 51 percent and 54 percent black voting age populations--the current Fourth Circuit has a 49 percent black voting age population. The few additional percentage points would not be enough to ensure the successful election of black judicial candidates.
 
 
 59
 Another serious obstacle to ensuring the election of black judicial candidates is the limited pool of eligible black lawyers. Under Alabama law, Ala. Const. amend. 328, Sec. 6.07, judges must be licensed attorneys. This requirement limits the eligible pool of candidates in a way that candidates for other representative bodies are not so confined. Even with reconfiguration, there is no guarantee that a black lawyer from the small number of those eligible would even seek to become a candidate. For example, the Fifth Circuit is currently composed of four counties and is allotted three circuit judges. In three of those four counties there is no black lawyer. In seven of the nineteen counties that comprise the challenged circuits, there are no black attorneys. Only the Tenth Circuit, Jefferson County, has more than one hundred black lawyers, with 105. The Fifteenth Circuit, Montgomery County, has 56, and no other circuit has more than 20. Of more than 9600 licensed lawyers in Alabama, only 295 are black. Approximately one-third of all of the black attorneys who have ever been licensed in Alabama were granted licenses in the past five years. Most judges practice law for several years before seeking a position on the bench; this experience time-lag also must be factored in when calculating the available pool of black potential candidates. The State's interest in having a pool of black lawyers large enough to give the voters a reasonable choice from which to select a qualified candidate must be considered when evaluating suggested remedies.
 
 
 60
 For the foregoing reasons, the district court did not err in rejecting appellants' first remedial option.
 
 2.
 
 61
 The second remedial option calls for carving the circuits and counties into districts--"either single-member districts or multi-member subdistricts with numbered places."[24] Appellants proposed that "[i]n Jefferson County, for example, two multi-member districts could be drawn--a majority black 'city division' from which a number of judges could run at-large for numbered places and a majority white 'county division' from which the remaining judges could run in a similar fashion." Record, vol. 5, at 49, No. 143.
 
 
 62
 In addition to raising the same questions of the available pool of qualified black potential judicial candidates that we discussed, supra, in the context of circuit reconfiguration, subdistricting would directly implicate the State's linkage interest. Linking a trial court judge's territorial jurisdiction and electoral base serves to preserve judicial accountability. The Alabama model reflects a belief that voters should have the right to hold a judge accountable for his or her performance. Subdistricting, however, would strip every voter residing beyond a judge's subdistrict of his or her participation in the judicial selection process--leaving the judge accountable only to those voters in his or her subdistrict. Even in the judge's own subdistrict, voters would be disfranchised: In white subdistricts the voting power of blacks would be diluted; in black subdistricts the voting power of whites would be diluted. The likely effects of the loss of minority influence would be more pronounced in this context of a lone decisionmaker, a trial judge, who would lack input from the colleagues elected by the rest of the citizenry of the jurisdiction.[25]
 
 
 63
 In linking the size of judicial electoral units and the trial court's territorial jurisdiction, Alabama has attempted to balance the desire for accountability of judges to their electorate along with the need to maintain judicial independence. Breaking this link would undermine the Alabama system of fostering an independent judiciary by holding judges accountable to a broad section of the population. Although utilizing partisan politics may inject a degree of "responsiveness" into the dynamic, any districting remedy that would further minimize the electoral base would encourage even greater "responsiveness" on the part of judges to the special interests of the people who elected them. It has been written that remedial plans in the legislative context may "reinforce[ ] racial stereotypes and threaten[ ] to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." Shaw v. Reno, --- U.S. ----, ----, 113 S.Ct. 2816, 2828, 125 L.Ed.2d 511 (1993). This proposition seems quite accurate in the context of state trial court judges who must not engage in traditional legislative "responsiveness."
 
 
 64
 Subdistricting would also increase the specter of "home cooking": Creating a smaller electorate would increase the pressure to favor constituents. Everyone agrees that in some politically volatile and controversial cases it is beneficial to have the electorate come from the entire circuit rather than some smaller portion. Appellants suggest that the judicial ethical code and the appellate process provide sufficient safeguards against favoritism concerns. But once court-ordered subdistricting sends the message, as it inevitably would, that race matters in the administration of justice, no procedure could mitigate the devastating effects. If favoritism concerns were rooted in racial issues, the fundamental fairness of the judicial system would continually be questioned. Such a redistricting remedy would reintroduce, to a greater degree, the very vices from which the appellants seek relief.
 
 
 65
 The district court did not err in rejecting appellants' second remedial option.
 
 
 66
 In sum, the many state policy interests we have discussed, including maintaining the link between a trial judge's electoral base and jurisdiction and ensuring a reasonable pool of qualified potential candidates, preclude the remedies appellants' propose; moreover these interests outweigh whatever possible vote dilution may have been shown in this case. The judgment of the district court is, therefore, AFFIRMED.
 
 
 67
 IT IS SO ORDERED.
 
 EDMONDSON, Circuit Judge, concurring:
 
 68
 I am convinced that today's result is right legally. But, much of what is said in today's court opinion seems unnecessary to decide this case and may hide the main point. The main point here is the same idea that I, in my concurring opinion, stressed as the holding in Nipper v. Smith, 39 F.3d 1494 (11th Cir.1994) (en banc), cert. denied, --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995): "each of the remedies discussed is precluded given the State's interest in and right to formulate its own judicial system." Id. at 1547 (Edmondson, J. concurring).
 
 
 69
 Let me say briefly the way I understand the law. The Voting Rights Act covers judicial elections. But, Alabama as a matter of law has the right--a right is an extremely weighty interest--to structure its judicial branch pretty much as Alabama thinks best. That structure now (and for a considerable time) involves at-large elections of trial judges from the jurisdictions they serve. This approach is neither irrational nor, in this country, rare. And, no evidence in this case shows that either the structure of the judicial system as a whole or specific judicial boundaries were drawn up to discriminate against any Alabama citizen on account of race. None of the judicial districts are unusual or strange. Cf. Gomillion v. Lightfoot, 364 U.S. 339, 340-42, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960) (involving "uncouth" election district); noted in, Houston Lawyers' Ass'n v. Attorney General, 501 U.S. 419, 426-28, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379 (1991). These few facts have great legal force. With a single stroke, they strike, in favor of Alabama, the balance of the circumstances. For me, they end this matter, sweeping the field and beating down the notion that a federal court might correctly impose some kind of restructuring "remedy" in this case.
 
 
 70
 These facts, as I understand the law, also allow us to keep clear of certain lines of investigation in cases such as this one. No need exists to look at winners and losers of past elections or to speculate about why particular judicial candidates won and others lost. Most important, no need (and I think no rightful, federal judicial power) exists to compare the strength and weaknesses--as a matter of political science--of Alabama's current system of electing trial judges with the system for which plaintiffs contend. Even if in a head-to-head comparison plaintiffs' proposed system were "better" (that is, the wiser choice--in terms of good government or political science practice and theory) than Alabama's present system, federal courts could not properly compel Alabama to change, given the circumstances of this case.
 
 
 71
 The basic structure of Alabama's judicial branch of government, including the shape of its judicial jurisdictions and the manner of selecting trial judges, is in the hands of Alabama's people. And, no evidence in this case shows that, in Alabama today, black people or anyone else is obstructed on account of race from voting or otherwise working politically, to change the structure.
 
 HATCHETT, Circuit Judge, dissenting:
 
 72
 Alabama has had a long and painful history of discriminating against its black citizens. In the area of voting rights, this discrimination has persisted despite constitutional amendments, Supreme Court decisions, and federal legislation. In the latest chapter of this history, black voters have turned to the Voting Rights Act (the Act) in an attempt to overcome Alabama's sad legacy. Fortunately, the Act has proved to be an invaluable tool in securing greater political representation for black Alabamans. Of course, the Act is not self-executing; federal courts have repeatedly fashioned relief in response to Alabama's violations of the law. In so doing, these courts have created an enormous body of case law, which includes extensive discussion of vote dilution claims under section 2 of the Act. When viewed against the backdrop of this precedent, the majority's opinion in this case stands as an anomaly in two respects.
 
 
 73
 First, federal courts have consistently declared that racially polarized voting has been, and remains, a fact of life in Alabama.[1] Indeed, when considering vote dilution claims in Alabama, federal courts have always found racially polarized voting. Such findings are consistent with the Justice Department's determination that "racially polarized voting is present at all levels of elections in Alabama, including judicial elections...." White v. State of Alabama, 867 F.Supp. 1519, 1552-53 (M.D.Ala.1994) (section 2 challenge to method of electing appellate judges in Alabama) (emphasis added). In this case involving trial judges, however, the majority holds that the appellants have failed to show racial bloc voting. In reaching this amazing result, a first in the history of Alabama voting rights jurisprudence, the majority has ignored the record in this case, this court's precedent, political reality, the history of the state, and what is obvious.
 
 
 74
 Second, federal courts have dutifully met the obligation under section 2 to impose remedial schemes on a wide variety of governmental entities.[2] The majority, however, has suddenly abandoned this paramount obligation, effectively holding that its colleagues in Alabama's judiciary, unlike officials in the state's other branches of government, are immune from the remedial powers of the federal courts. Again, in arriving at this aberrational result, the majority has ignored the record in this case, this court's precedent, and political reality.
 
 
 75
 Because the majority has relied on its own view, rather than rigorously applying this court's precedent, in reaching its result, I find it necessary to outline the controlling law. Moreover, because the majority has not done so, I find it necessary to engage in the required circuit-by-circuit analysis of the facts of this case. After applying the law of this court to these facts, I can only conclude that the appellants have demonstrated a section 2 violation, for which a remedy can, and must, be employed. Accordingly, I respectfully dissent.
 
 
 76
 In discussing the issues, I will follow the outline listed below.
 
 
 77
 I. The Supreme Court's Gingles /Totality-of-the-Circumstances Test
 
 II. The Law of this Circuit
 A. The Gingles Prong
 
 78
 1. The First Two Factors: The Possibility of a Remedy
 
 2. The Third Factor: Racial Bloc Voting
 B. The Totality-of-the-Circumstances Prong
 
 79
 III. Application of the Law to the Facts of this Case
 
 A. Applying the Third Gingles Factor
 1. The Fourth Circuit
 2. The Fifth Circuit
 3. The Sixth Circuit
 4. The Seventh Circuit
 5. The Tenth Circuit
 6. The Thirteenth Circuit
 7. The Fifteenth Circuit
 8. The Twentieth Circuit
 
 80
 9. The Twenty-Third Circuit10. The Twenty-Sixth Circuit
 
 11. Summary
 
 81
 B. Applying the First and Second Gingles Factors
 
 1. Reconfiguration of Circuits
 2. Subdistricts
 3. Cumulative Voting
 
 82
 C. Applying the Totality-of-the-Circumstances Prong
 
 
 83
 1. Extent Blacks Have Been Elected to Public Office
 
 
 84
 2. History of Voting-Related Discrimination
 
 3. Typical Discriminatory Voting Practices
 
 85
 4. Discrimination in Education, Employment, and Health
 
 5. Racial Appeals in Political Campaigns
 6. Alabama's Tenuous Interests (Revisited)
 IV. Conclusion
 
 86
 I. The Supreme Court's Gingles /Totality-of-the-Circumstances Test
 
 
 87
 The focus of the section 2 inquiry is whether a "State or political subdivision" has imposed a "standard, practice, or procedure" that provides minority voters with "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. Sec. 1973. It is clear that minority voters can bring a section 2 challenge through a claim of vote dilution. See, e.g., Voinovich v. Quilter, --- U.S. ----, ----, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993). Despite this clear law, Judge Edmondson, in his concurrence, suggests that minority voters cannot bring a section 2 challenge through a claim of vote dilution in the judicial election context. If this is in fact Judge Edmondson's suggestion, it is incorrect. For sure, minority voters can bring a section 2 challenge to judicial elections through a claim of vote dilution. See Chisom v. Roemer, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (vote dilution challenge to judicial elections).
 
 
 88
 The Supreme Court has also made it abundantly clear that minority voters have the burden of satisfying three prerequisites in order to show vote dilution.
 
 
 89
 First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed,--usually to defeat the minority's preferred candidate.
 
 
 90
 Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986) (citations omitted). The Supreme Court has recently stated that while these three factors are often conclusive, they do not "necessarily and in all circumstances demonstrate [vote] dilution." Johnson v. De Grandy, --- U.S. ----, ----, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994).
 
 
 91
 Instead, "courts must also examine other evidence in the totality of the circumstances" before finding a violation of section 2. De Grandy, --- U.S. at ----, 114 S.Ct. at 2657. These other circumstances include: (1) the history of voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices that may enhance the opportunity for discrimination against a minority group; (4) whether members of the minority group have been excluded from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health which hinder their ability to participate effectively in the political process; (6) whether overt or subtle racial appeals have been made in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether elected officials are unresponsive to the particularized needs of members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of the contested practice or structure is tenuous. See De Grandy, --- U.S. at ---- - ---- n. 9, 114 S.Ct. at 2656-57 n. 9.[3] "[T]he most important Senate Report factors ... are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.' " Gingles, 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), reprinted in, 1982 U.S.C.C.A.N. 177, 206-08).[4]
 
 
 92
 Although the above framework is firmly established, the Supreme Court has not clearly delineated its application, particularly in the context of judicial elections. See Chisom, 501 U.S. at 390, 111 S.Ct. at 2361 (leaving open the question of what "must be proved to establish a violation" of section 2 in the judicial election context).
 
 II. The Law of this Circuit
 
 93
 This is the third en banc case in which this court has grappled with the basic framework of the Gingles /totality-of-the-circumstances test. See Nipper v. Smith, 39 F.3d 1494 (11th Cir.1994) (en banc ), cert. denied, --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); Solomon v. Liberty County, Fla., 899 F.2d 1012 (11th Cir.1990) (en banc ), cert. denied, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). Although Nipper and Solomon spawned seven conflicting opinions, a majority of this court agreed upon a limited set of holdings in both cases. With respect to the Gingles prong, a majority of this court has: (1) supplemented the first two factors in the judicial election context; and (2) clarified how to weigh expert statistical evidence when considering the third factor. See Nipper, 39 F.3d at 1530-33, 1539-41; Solomon, 899 F.2d at 1020-21. With respect to the totality-of-the-circumstances prong, a majority of this court has added the state's interest in maintaining its system as a factor to consider in section 2 challenges to judicial elections. See Nipper, 39 F.3d at 1528-30. This court, however, has yet to clarify the significance of the state's interests in relation to the Senate Report factors.
 
 A. The Gingles Prong
 
 94
 Although the Gingles prong contemplates three factors, this court has transformed it into a two-part inquiry when considering section 2 challenges to judicial elections. In so doing, this court explained that the "three factors are used to evaluate two critical points: (1) the possibility of a remedy and (2) the existence of racially polarized, legally significant racial bloc voting." Nipper, 39 F.3d at 1530.
 
 
 95
 1. The First Two Factors: The Possibility of a Remedy
 
 
 96
 In Nipper, the leading opinion carried a majority in part III(B)(1). That majority held that in addition to requiring the plaintiff to show numerousness/compactness and cohesiveness, "[t]he first Gingles precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases." Nipper, 39 F.3d at 1530. Thus, a plaintiff can only satisfy the first two factors of the Gingles threshold inquiry if a court finds that "within the state's judicial model, there exists an alternative election scheme that could serve as an appropriate section 2 remedy." Nipper, 39 F.3d at 1531.[5]
 
 
 97
 In my dissent in Nipper, I did not think it was appropriate to articulate fully my disagreement with the holding in part III(B)(1) because the issue of remedy was not properly before the court. Since the majority has implemented the reasoning in that premature holding to decide this case, I now find it necessary to illustrate how part III(B)(1) distorted clear Supreme Court precedent.
 
 
 98
 Essentially, in part III(B)(1) of Nipper, a majority of this court subtly substituted the word "remedy" for the word "benchmark," and thereby altered the Gingles threshold inquiry. The Supreme Court has clearly stated that the first two Gingles factors require a court to "find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." Holder v. Hall, --- U.S. ----, ----, 114 S.Ct. 2581, 2585, 129 L.Ed.2d 687 (1994) (emphasis added). This construction of the first two factors stems from Justice O'Connor's concurrence in Gingles, in which she explained that " '[t]he phrase vote dilution itself suggests a norm with respect to which the fact of dilution may be ascertained.' " Holder, --- U.S. at ---- - ----, 114 S.Ct. at 2585-86 (quoting Gingles, 478 U.S. at 88, 106 S.Ct. at 2786 (O'Connor, J., concurring)).
 
 
 99
 Thus, the first two Gingles factors require the existence of a hypothetical "benchmark" for the purpose of measuring vote dilution; they do not require a "remedy," something completely different. Indeed, Justice O'Connor articulated the difference between the two in Holder, explaining that an "alternative benchmark is often self-evident. In a challenge to a multi-member at-large system, for example, a court may compare it to a system of multiple single-member districts.... Though there may be disagreements about the precise appropriate alternative practice in these cases, there are at least some objectively determinable constraints on the dilution inquiry." Holder, --- U.S. at ---- - ----, 114 S.Ct. at 2589-90 (O'Connor, J., concurring) (citations omitted) (emphasis added). In other words, the first two preconditions merely contemplate an objective basis used to assess the vote dilution inquiry; they do not contemplate a "remedy," or the "precise appropriate alternative practice" that will ultimately be implemented.
 
 
 100
 In Holder, the Supreme Court held that the size of a governing authority is not susceptible to a section 2 vote dilution challenge because "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison." Holder, --- U.S. at ----, 114 S.Ct. at 2586. Despite the contentions of a majority of this court, this holding does not inject the state's interests in potential remedies into the Gingles stage of the inquiry, for the Supreme Court was not concerned with the state's interest in maintaining the size of its governing body. Instead, the Supreme Court simply found that such claims cannot withstand the first two Gingles factors because they are "inherently standardless," even at the level of hypothetical abstraction. Holder, --- U.S. at ----, 114 S.Ct. at 2588. It is important to remember that the standard for comparison (i.e., benchmark) is purely hypothetical; therefore, the state's interests in the actual implementation of potential remedies are irrelevant.
 
 
 101
 In sum, a majority of this court has erroneously placed remedy as the threshold issue in the section 2 inquiry. This puts the cart before the horse, for remedy, usually the last consideration in litigation, is now the first factor that a court considers. Common sense dictates that courts should first determine whether a section 2 violation has occurred. When minority voters establish a violation, then the issue of remedy becomes ripe.
 
 
 102
 After saying all the above, I still recognize that the holding in part III(B)(1) of Nipper, no matter how incorrect I deem it to be, controls the application of the first two Gingles factors to the facts of this case. Accordingly, this is the standard that I will employ. Before I do so, however, two points must be clarified.
 
 
 103
 First, when considering the first two Gingles factors, the spectrum of possible remedies is not limited to the ones that the section 2 plaintiff proposes, for it is the court's responsibility to consider all permissible remedies. See Nipper, 39 F.3d at 1531 (the "district court must determine as part of the Gingles threshold inquiry whether it can fashion a permissible remedy") (emphasis added). It is ironic that, in the judicial election context, the section 2 plaintiff is now the party with the burden of proposing possible remedies for court approval. Typically, the burden is on the state to propose a remedial scheme that "conform[s] with Section 2" and satisfies the court. Dillard v. Crenshaw County, Ala., 831 F.2d 246, 249 (11th Cir.1987). Under this traditional framework, although the state bears the burden of coming forward with potential alternatives, it is ultimately the "role of the district court to fashion a narrowly and well tailored remedy." Dillard, 831 F.2d at 253. Likewise, although section 2 plaintiffs, as opposed to the state, are now required to offer a feasible alternative in the judicial election context, it is still the ultimate responsibility of the court to consider all potential remedies if it finds that the ones the plaintiffs offer do not suffice. It has always been Congress's intent that "[t]he court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), reprinted in, 1982 U.S.C.C.A.N. 177, 208 (emphasis added).
 
 
 104
 The second point that needs to be clarified is the standard for judging the feasibility of a remedy. In Nipper, the majority used several different phrases to describe the standard of feasibility: (1) "a permissible remedy in the particular context of the challenged system"; (2) "a remedy within the confines of the state's judicial model that does not undermine the administration of justice"; (3) "within the state's judicial model, there exists an alternative scheme that could serve as an appropriate section 2 remedy"; and (4) "a workable remedy within the confines of the state's system of government." Nipper, 39 F.3d at 1531-33. These phrases mean that although a remedy may not drastically alter the substance of the state's judicial model, it may alter the method used to select judges, for "[i]t has long been the rule that ... some alteration in the State's election system may be called for in order to remedy" a section 2 violation. Brief of the United States in Support of Petition for Certiorari at 15, Nipper v. Smith, --- U.S. ----, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995) (No. 94-1463). Thus, a court may consider cumulative voting as a remedy to a numbered place system because that alternative only alters the method of selecting judges. Similarly, a court may consider subdistricting as a remedy to an at-large system because that alternative only bears on the method of selecting judges. A court may also change the geographical makeup of a circuit system so as to alter the electoral bodies that vote for judges. This alternative, which primarily changes the method of selecting judges, does not fundamentally alter the state's judicial model; in fact, this type of modification is routinely made to reflect shifts in caseload and population.[6] Finally, these phrases also indicate that a potential remedy need not be the state's favored option. Likewise, the proposed remedy need not employ the system that the court believes to be the best or most efficient. Instead, the proposed remedy must simply be "workable." Nipper, 39 F.3d at 1533 (quoting Holder, --- U.S. at ----, 114 S.Ct. at 2586). Stated differently, the remedy is feasible as long as it "does not undermine the administration of justice." Nipper, 39 F.3d at 1531.
 
 2. The Third Factor: Racial Bloc Voting
 
 105
 In vote dilution cases, courts must often decide the third Gingles factor, whether majority block voting usually defeats minority candidates, on the basis of statistical evidence. This court has constructed two guiding principles for courts to employ when weighing such evidence.
 
 
 106
 First, this court has explained that the statistical "evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates." Nipper, 39 F.3d at 1539 (quoting Westwego Citizens for Better Government v. Westwego, 872 F.2d 1201, 1208 n. 7 (5th Cir.1989)).[7] Indeed, elections involving only white candidates "reveal little about the issue to be determined: the capacity for white bloc voting usually to defeat black candidates of choice." Nipper, 39 F.3d at 1540. Thus, elections involving white candidates are only probative "[w]here black voters have a genuine candidate of choice"; they are not probative when "the candidate of choice of black voters was also the preferred candidate of the white voters." Nipper, 39 F.3d at 1540-41. Furthermore, a court cannot assume, "based only on a cursory examination[,]" that because the majority of black voters supported a white candidate, that candidate was a "genuine candidate of choice." Nipper, 39 F.3d at 1540. Instead, in order to be a genuine candidate of choice, a court must find some support, such as "anecdotal testimonial evidence, polling data, a review of the appeals made during the campaign, [or] turnout information, indicating [that] black voters were energized to support a particular white candidate." Nipper, 39 F.3d at 1540. In sum, biracial elections typically will be most probative, and since the inquiry is whether white bloc voting works to defeat black candidates, the most important statistic is the white crossover vote in biracial elections.
 
 
 107
 As a second guiding principle, this court has announced when this most probative statistical evidence satisfies the third Gingles factor as a matter of law. Specifically, statistical evidence showing that no black candidate has ever been elected, coupled with an average white crossover vote of twenty-one percent, is "sufficient as a matter of law to establish that white voting ... is racially polarized to the extent that blacks are unable to elect the candidates of their choice." Solomon, 899 F.2d at 1021 (Kravitch, J., specially concurring).[8] It is important to note that racial bloc voting often exists when the average white crossover vote is greater than twenty-one percent. Indeed, in Gingles, the Supreme Court found racial bloc voting where "white support for black candidates ranged between 8% and 50%, and ... between 28% and 49%." Gingles, 478 U.S. at 59, 106 S.Ct. at 2771 (emphasis added). Thus, an average white crossover vote greater than twenty-one percent, coupled with other factors, including the fact that no black candidate has ever been elected to office, can constitute racially polarized voting.
 
 B. The Totality-of-the-Circumstances Prong
 
 108
 In Nipper, a majority of this court adopted dicta from Justice Stevens's opinion in Houston Lawyers' Ass'n v. Attorney Gen. of Tex., 501 U.S. 419, 426-27, 111 S.Ct. 2376, 2380-81, 115 L.Ed.2d 379 (1991), which stated that the state's interest in maintaining its judicial system is a legitimate factor to consider under the totality of the circumstances. See Nipper, 39 F.3d at 1529 (in part III(A) of the leading opinion, which carried a majority). Thus, in addition to the Senate Report factors, this court also considers the state's interests when analyzing the totality-of-the-circumstances prong in section 2 challenges to judicial elections.
 
 
 109
 Exactly what weight a court should place on the state's interests is unclear. The purpose of the totality-of-the-circumstances prong is to aid in the overall determination of whether section 2 plaintiffs have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. Sec. 1973(b). Unlike the Senate Report factors, the state's interests are, for the most part, irrelevant to this inquiry; thus, they should carry minimal weight in the totality-of-the-circumstances analysis. Furthermore, this court already considers the state's interests in maintaining its judicial system during the remedy phase of the Gingles prong; thus, it is pointless and repetitive to give the state's interest great weight at this stage.
 
 
 110
 III. Application of the Law to the Facts of this Case
 
 
 111
 Although Nipper injected remedy into the first and second Gingles factors, thereby making it the threshold issue in challenges to judicial elections, the majority begins its analysis in this case with the third Gingles factor, racially polarized voting. For the sake of clarity, I will do the same. Unlike the majority, however, I will not defer, under the clearly erroneous standard, to the district court because it committed several legal errors in arriving at its findings. See Gingles, 478 U.S. at 79, 106 S.Ct. at 2781. Also, unlike the majority, I will undertake the required circuit-by-circuit analysis in reviewing the district court's racial bloc voting findings. See Gingles, 478 U.S. at 59 n. 28, 106 S.Ct. at 2771 n. 28 (the "racially polarized voting" inquiry is "district-specific"). Indeed, the majority's failure to engage in the required circuit-by-circuit analysis is a serious flaw, for the district court's legal errors become obvious under this more particularized level of scrutiny.
 
 
 112
 After reviewing the district court's racial bloc voting determinations, I will proceed to the first and second Gingles factors, which, under Nipper, contemplate the state's interest in potential remedies, and then to the totality-of-the-circumstances inquiry. Once again, I will not defer to the district court's findings because the issues of remedy and "the substantiality of [Alabama's] interest under Sec. 2 [are] question[s] of law for this court to determine de novo." League of United Latin American Citizens v. Clements, 999 F.2d 831, 871 (5th Cir.1993) (en banc ) (LULAC ), cert. denied, --- U.S. ----, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).
 
 A. Applying the Third Gingles Factor
 
 113
 As will become apparent, the following circuit-by-circuit analysis shows that the district court repeatedly engaged in the same egregious legal errors in its analysis of racial bloc voting. So as not to become too repetitive, I will first explain the legal errors that the district court committed, and then list, circuit-by-circuit, the facts that are relevant to those errors.
 
 
 114
 First, the district court ignored the evidence that black lawyers, faced with the prospect of almost certain defeat, had generally been deterred from running for judgeships. See White, 867 F.Supp. at 1553-54 ("[T]he evidence before the court suggests that because of the difficulty of running for [Alabama judgeships], qualified blacks do not seek election.... Potential judicial candidates who would be the most likely first choices of the black community are not running."). Instead, the district court emphasized that, in some circuits, black lawyers had never run for judgeships. This is an improper consideration as a matter of law. See Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25; Westwego, 872 F.2d at 1208-09; White, 867 F.Supp. at 1554. Then, in the absence of extensive data concerning biracial elections for circuit and district judgeships, the district court failed to look to the most probative statistics--the white crossover vote in biracial elections for other offices. See Nipper, 39 F.3d at 1539. Rather, without determining whether one of the candidates was a genuine candidate of choice of the black voters, the district court improperly relied on statistical data concerning elections between white candidates. See Nipper, 39 F.3d at 1540-41. In giving these elections great probative weight, the district court wrongly assumed, "based only on a cursory examination[,]" that because the majority of black voters supported a white candidate, that candidate was a genuine candidate of choice. Nipper, 39 F.3d at 1540.[9]
 
 
 115
 Finally, and perhaps most importantly, the district court ignored this court's en banc decision in Solomon. In the ten challenged circuits, not one black candidate has attained a district or circuit judgeship through a contested election.[10] Moreover, the average white crossover vote in each circuit is lower than, or comparable to, the twenty-one percent average in Solomon. The combination of these two facts is sufficient as a matter of law to satisfy the third Gingles factor. See Solomon, 899 F.2d at 1021 (Kravitch, J., specially concurring).
 
 1. The Fourth Circuit
 
 116
 The Fourth Circuit has two circuit judges. Neither are black. Blacks, however, comprise forty-nine percent of the voting age population in the Fourth Circuit. The parties stipulated that at least until the 1980s, strong racially polarized voting existed in Hale and Dallas Counties, which are part of the Fourth Circuit.[11] Nonetheless, the district court, without even mentioning this evidence, determined that racially polarized voting does not exist in the circuit.
 
 
 117
 In so doing, the district court emphasized, improperly, that "[n]o black lawyer has ever chosen to run for circuit judge" in the Fourth Circuit. Southern Christian Leadership Conference of Alabama v. Evans, 785 F.Supp. 1469, 1480 (M.D.Ala.1992) (SCLC ). The district court also erroneously emphasized that "the candidate preferred by the circuit's black voters won in the circuit eighty-eight percent of the time," without determining whether those candidates were genuine candidates of choice. SCLC, 785 F.Supp. at 1480.
 
 
 118
 Finally, the district court failed to look at the most probative statistical evidence, the white crossover vote in biracial elections. Had the district court considered this evidence, it would have recognized that the appellants showed racial bloc voting as a matter of law because no black has ever been elected to the position of circuit judge, and the average white crossover vote in the Fourth Circuit is a mere fifteen percent.
 
 2. The Fifth Circuit
 
 119
 The Fifth Circuit has three circuit judges. None are black. Blacks, however, comprise thirty-eight percent of the voting age population in the Fifth Circuit.
 
 
 120
 In determining that the appellants failed to show racially polarized voting, the district court erroneously emphasized that "[n]o black candidate has run for circuit judge" in the Fifth Circuit. SCLC, 785 F.Supp. at 1480. The district court also erred in emphasizing that "the candidate preferred by blacks in the circuit won eighty-five percent of the time," without determining whether those candidates were genuine candidates of choice. SCLC, 785 F.Supp. at 1480.
 
 
 121
 Again, the district court failed to consider the most probative evidence, the white crossover vote in biracial elections. Had it done so, it would have recognized that the appellants established the third Gingles factor as a matter of law, for no black has ever been elected to the position of circuit judge, and the average white crossover vote in the Fifth Circuit is twenty-one percent.
 
 3. The Sixth Circuit
 
 122
 The Sixth Circuit has three circuit judges. None are black. Blacks comprise twenty-three percent of the voting age population in the Sixth Circuit.
 
 
 123
 In determining that the appellants failed to satisfy the third Gingles factor, the district court erroneously emphasized that "[i]n the eight contested trial judge elections within the Sixth Circuit since 1976, none involved a black candidate." SCLC, 785 F.Supp. at 1481. The district court also erroneously emphasized that "[t]he candidate preferred by blacks in statewide judicial elections prevailed in the circuit twenty-one out of twenty-two times," but did not analyze whether those candidates were genuine candidates of choice. SCLC, 785 F.Supp. at 1481.
 
 
 124
 Once again, the district court ignored the most probative evidence and the Solomon standard. Racially polarized voting exists in the Sixth Circuit as a matter of law, for no black has ever been elected to sit on the Sixth Circuit, and the average white crossover vote is only twenty percent.
 
 4. The Seventh Circuit
 
 125
 The Seventh Circuit has four circuit judges. None are black. Blacks comprise sixteen percent of the voting age population in the Seventh Circuit.
 
 
 126
 Once again, the district court, without determining whether genuine candidates of choice were involved, incorrectly emphasized that "[i]n five of eight circuit judge elections, the candidate preferred by black voters won.... In statewide judicial elections, the candidate preferred by black voters won in the circuit seventy-six percent of the time." SCLC, 785 F.Supp. at 1481.
 
 
 127
 Again, the district court ignored the most probative evidence and the Solomon standard, for no black has ever been elected to sit on the Seventh Circuit, and the average white crossover vote is twenty-five percent. Indeed, a black candidate, Nathaniel Owens, has twice run for the circuit bench. He lost both times. In his 1978 loss, he won approximately sixty-seven percent of the black vote, but only sixteen percent of the white vote. In his 1982 loss, he won 100 percent of the black vote, and only approximately 19 percent of the white vote.
 
 5. The Tenth Circuit
 
 128
 Appellants challenge the system for electing both circuit and district judges in the Tenth Circuit. Since the Tenth Circuit is a single-county circuit, the district and circuit court elections involve the same electorate. Thus, the two challenges can be considered simultaneously.
 
 
 129
 The Tenth Circuit has a black voting age population of thirty-two percent. But, only three of the twenty-four circuit judges in the Tenth Circuit are black; all were appointed.[12] Of the eleven district judges in the Tenth Circuit, none are black. Ralph Cook, one of the three black circuit judges in the Tenth Circuit, previously served as a district judge. Cook, who ran unopposed, was elected to the district court bench in 1976. This unopposed victory is the only instance where a black has achieved a judicial position through election in any of the ten challenged circuits.
 
 
 130
 In finding that the appellants failed to show racial bloc voting in the Tenth Circuit, the district court explained that "[i]n twenty-one of twenty-three (91 percent), contested circuit court elections, and in nine of eleven (82 percent) contested district court elections, the candidate preferred by black voters was elected.... In the twenty-six statewide judicial elections since 1976, a candidate preferred by black voters has won on each occasion." SCLC, 785 F.Supp. at 1482. Thus, once again, the district court erroneously relied on elections between white candidates without determining whether one of those candidates was a genuine candidate of choice of the black voters.
 
 
 131
 Because Judge Cook's unopposed victory in 1976 does not count, no black has ever achieved a judicial position in the Tenth Circuit through election. See Gingles, 478 U.S. at 51, 106 S.Ct. at 2766-67 (unopposed victories do not count against a finding of racial bloc voting). In the two elections where black candidates ran against white candidates for district judgeships, the black candidates lost. In those two elections, the black candidates, Raymond Chambliss and Emory Anthony, received nearly 100 percent of the black vote, and only approximately 24 percent of the white vote. Moreover, the average white crossover vote in the Tenth Circuit is twenty-two percent. Thus, once again, the appellants have satisfied the third Gingles factor.
 
 6. The Thirteenth Circuit
 
 132
 Appellants challenge the system for electing both circuit and district judges in the Thirteenth Circuit. Like the Tenth Circuit, the Thirteenth Circuit is a single-county circuit. Thus, the two challenges can be considered simultaneously.
 
 
 133
 The Thirteenth Circuit, which has a black voting age population of twenty-eight percent, is comprised of ten circuit judges; only one is black. Of the four district judges in the circuit, only one is black. Both black judges were appointed to the bench.
 
 
 134
 In finding no racial bloc voting, the district court analyzed elections between white candidates without determining whether one of the candidates was a genuine candidate of choice of the black voters. The district court simply reasoned: "In the four circuit court elections, the candidate favored by black voters prevailed on each occasion. In district court elections ... the black preferred candidate has won seventy-five percent of the time. In statewide elections, the Thirteenth Circuit vote has gone to the black preferred candidate eighty-five percent of the time." SCLC, 785 F.Supp. at 1483-84.
 
 
 135
 The district court also failed to consider the most probative evidence. The parties stipulated that at least until 1982, racially polarized voting occurred in the Thirteenth Circuit. The district court did not even mention this fact. Furthermore, no black has ever been elected to a circuit or district judgeship in the Thirteenth Circuit. In 1980, Frankie Fields Smith entered, and lost, the Democratic primary for a district judge position. Although she received almost ninety-five percent of the black vote, she only received approximately eight percent of the white vote. Smith ran again in 1986. Because she entered the race late, she did not run with the benefit of organized party support. Nonetheless, she received almost forty-five percent of the black vote, but less than one percent of the white vote. Had the district court considered the low crossover votes in Fields's elections, and the low average white crossover vote of twenty percent, it would have recognized that, under Solomon, the appellants established the third Gingles factor as a matter of law.
 
 7. The Fifteenth Circuit
 
 136
 Appellants challenge the system for electing both circuit and district judges in the Fifteenth Circuit. Since the Fifteenth Circuit is a single-county circuit, the two challenges can be considered simultaneously.
 
 
 137
 Despite the Fifteenth Circuit's black voting age population of thirty-eight percent, only one of its seven circuit judges is black. None of its three district judges are black.
 
 
 138
 The parties stipulated that, in the Fifteenth Circuit, racially polarized voting existed at least until 1978. The district court ignored this highly probative evidence. Instead, the district court chose to emphasize irrelevant elections between white candidates, explaining: "In eight of the ten trial judge elections ... the black preferred candidate prevailed.... [S]tatewide judicial candidates preferred by blacks have won the county vote on twenty-two of twenty-six occasions." SCLC, 785 F.Supp. at 1484.
 
 
 139
 The district court also made the mistake of ignoring Solomon. No black has ever been elected to a district or circuit judgeship in the Fifteenth Circuit, and the average white crossover vote is twenty-two percent.
 
 8. The Twentieth Circuit
 
 140
 The Twentieth Circuit has three circuit judges. None are black. Blacks comprise twenty-two percent of the voting age population in the Twentieth Circuit.
 
 
 141
 Of course, the district court incorrectly emphasized elections between white candidates, without undertaking the genuine candidate of choice inquiry, reasoning: "The circuit judge candidate preferred by blacks has been successful in two of the four contested elections since 1976, and the statewide judicial candidate favored by black voters has won the circuit vote seventeen of twenty-six times." SCLC, 785 F.Supp. at 1485.
 
 
 142
 The district court also failed to consider the most probative evidence and the Solomon standard. If it had done so, it would have recognized that the appellants satisfied the third Gingles factor as a matter of law. No black has ever been elected to the circuit bench, and the average white crossover vote is only twenty percent.
 
 9. The Twenty-Third Circuit
 
 143
 The Twenty-Third Circuit has six circuit judges. None are black. Blacks comprise nineteen percent of the voting age population.
 
 
 144
 The district court erroneously relied on elections between white candidates, explaining that "[i]n the few contested judicial elections within the Twenty-Third Circuit, the candidate preferred by black voters prevailed in three of the three circuit court elections and in four of the six district court elections. In statewide judicial elections, the county vote has gone with the candidate preferred by blacks sixty-five percent of the time." SCLC, 785 F.Supp. at 1485.
 
 
 145
 Once again, the district court ignored the most probative evidence and Solomon. No black has ever been elected to the circuit court bench, and the average white crossover vote in the Twenty-Third Circuit is twenty-two percent. Indeed, in perhaps the most relevant election, Al Beckles, a black candidate, unsuccessfully ran for the district bench in 1990. Although he received more than eighty percent of the black vote, he received less than five percent of the white vote.
 
 10. The Twenty-Sixth Circuit
 
 146
 Appellants challenge the system for electing both circuit and district judges in the Twenty-Sixth Circuit. Like the other circuits where the appellants have made a challenge at both the circuit and district level, the Twenty-Sixth Circuit is a single-county circuit. Thus, the two challenges can be considered simultaneously.
 
 
 147
 The Twenty-Sixth Circuit has two circuit and two district judges. None are black. Blacks, however, comprise thirty-six percent of the voting age population. No black has ever been elected to a district or circuit judgeship in the Twenty-Sixth Circuit. The average white crossover vote is a mere sixteen percent. Thus, under Solomon, the appellants established racially polarized voting as a matter of law in the Twenty-Sixth Circuit.
 
 11. Summary
 
 148
 The following chart summarizes the relevant facts for each of the ten challenged circuits.[13]
 
 
 149
 B. Applying the First and Second Gingles Factors
 
 
 150
 The first Gingles factor requires the appellants to show numerousness and compactness in the challenged circuits. Appellees "concede that such a showing has been made." SCLC, 785 F.Supp. at 1472.[14] The second Gingles factor requires a showing of political cohesiveness. The district court found that the appellants "have fully established a cohesion of the black vote." SCLC, 785 F.Supp. at 1472. The appellees do not challenge this finding.
 
 
 151
 The majority, however, holds that the appellants have failed to satisfy the first and second Gingles factors, as this court has formulated them in the judicial election context, because they have failed to propose a feasible remedy. Accordingly, I will address the majority's contentions, keeping in mind this court's duty to consider all possible alternatives. I conclude that the appellants have proposed two "workable" remedies that do not "undermine the administration of justice." I also believe that cumulative voting, which was not proposed, constitutes a "workable" alternative.
 
 1. Reconfiguration of Circuits
 
 152
 The appellants have proposed realigning counties in the Fourth and Fifth Circuits with counties in neighboring circuits in order to create three majority black circuits. The majority holds that this remedy is not feasible because: (1) it fails to take into account factors that contribute to the allocation of judicial resources; (2) it would dilute black voting power in the counties that are not realigned into the majority black circuits; (3) it would make race the linchpin of the judicial system; (4) it would not ensure the success of a black candidate; and (5) the pool of black lawyers in the reconfigured circuits would be too small to give voters a reasonable choice of candidates. I will address each of these contentions in turn.
 
 
 153
 First, the majority explains that the proposed reconfiguration fails to take into account factors related to judicial resources, such as caseload and population. This contention is false. The three new circuits would have populations ranging from 50,194 to 76,387. The forty circuits in Alabama have a population range of 27,814 to 651,525, and many are in the range of the proposed circuits. Furthermore, the projected caseload for the proposed circuits would range from 1,070 to 1,596 cases filed per year.[15] The forty circuits in Alabama have a caseload range of 721 to 32,826 cases filed per year, and many of the circuits have caseloads similar to the proposed circuits. In short, when considering all aspects of judicial resources, the proposed reconfigured circuits would be quite ordinary. The majority also contends that the proposed reconfiguration would force Bibb County, with a population of 16,576, to become a single-county circuit. The Thirty-Fourth Circuit, however, is solely comprised of Franklin County, which only has a population of 27,814. More importantly, Bibb County could easily be realigned with a neighboring circuit, such as the Nineteenth Circuit. The majority's assertion that Bibb County would have to stand on its own is wrong.
 
 
 154
 The majority's next contention is that the vote of blacks not included in the reconfigured circuits will be diluted. For example, although blacks only comprise eighteen percent of the voting age population in Bibb County, they are currently part of the Fourth Circuit, which has a black voting age population of forty-nine percent. Since the proposal plans to realign the Fourth Circuit into a majority black circuit, which does not include Bibb County, the black voters of Bibb County will no longer enjoy the status of being members of a large minority. Such reasoning, however, defeats the purpose of section 2, which is to provide minorities with the opportunity to elect candidates of their choice. See 42 U.S.C. Sec. 1973(b). Congress has decided that it is better to create districts where minorities can elect representatives of their choice, rather than to continue to allow them to influence elections as a mere swing vote. In redrawing districts, some minorities will always be excluded, but this is a policy decision that Congress has made, and courts must enforce. As Chief Judge Tjoflat has recognized, "the goal of section 2 is not to maximize the political clout of minorities, but rather to ensure minority representation in government.... [E]ven if such a policy actually reduces the overall political responsiveness to minority needs--the policy choice belongs to Congress." Solomon v. Liberty County, Fla., 865 F.2d 1566, 1583 (11th Cir.1988), vacated, 873 F.2d 248 (11th Cir.1989) (en banc ). Indeed, in footnote 25, the majority concedes that "the Voting Rights Act guarantees voters the right to elect candidates of their choice, not merely the right to influence election results[,]" thereby undermining its concerns about excluded black voters.
 
 
 155
 The majority's third contention is that the sole purpose of the reconfiguration is to assist in the election of black judges, and this would improperly thrust race into the judicial process; as a result, the public would lose confidence in the impartiality of the system. The Supreme Court's decision in Chisom, 501 U.S. 380, 111 S.Ct. 2354, has essentially foreclosed this argument. Put simply, Chisom holds that section 2 applies to judicial elections; this holding necessarily entails remedies that will purposefully assist in the election of black judges.
 
 
 156
 The majority's fourth problem with the reconfiguration remedy is that it will not ensure the success of black judicial candidates. The purpose of section 2, however, is to provide minorities with an equal opportunity to elect representatives of their choice; its purpose is not to ensure the success of minority candidates. In fact, the proposed reconfiguration will result in three circuits with black voting age populations of sixty-three percent, fifty-four percent, and fifty-one percent, thereby providing the equal opportunity that section 2 contemplates. Furthermore, the total percentage of black population in the three proposed circuits is even higher: sixty-six percent, fifty-nine percent, and fifty-six percent. Thus, blacks may enjoy a higher percentage of voting age population in the future. The majority seems to ignore the fact that the proposed remedy is prospective in nature.
 
 
 157
 Finally, the majority contends that because all judges in Alabama must be lawyers, the proposed circuits need a larger pool of black lawyers from which to select judges. One of the proposed circuits would have thirteen black lawyers out of a total of seventy-seven lawyers; another would have thirteen black lawyers out of a total of fifty-four lawyers; the third would have two black lawyers out of a total of thirty-four lawyers. When compared to the present number of lawyers in many jurisdictions in Alabama, the proposed circuits provide an ample number of lawyers from which to select judges.[16] Indeed, nine circuits in Alabama elect their circuit judges from a pool of thirty-four lawyers or less. The statistics are even more revealing when one considers district court elections. Lowndes County presently elects its district judge from a pool of three lawyers. Several other counties in Alabama elect their district judges from a total pool of five lawyers. Almost twenty percent of the counties in Alabama elect their district judges from a pool of ten lawyers or less. Another forty percent of the counties elect their district judges from a pool of twenty lawyers or less. Alabama's judicial system is able to operate in these districts and circuits, and the proposed circuits should be able to do the same. Put simply, after considering these facts, the two proposed circuits with thirteen black lawyers provide the voters with a sufficient pool of black lawyers from which to choose. In addition, the number of black lawyers in Alabama is increasing rapidly. Thus, the proposed circuit with two black lawyers will have more in the near future. Again, the majority ignores the fact that the remedy is prospective in nature.
 
 2. Subdistricts
 
 158
 The appellants have also proposed dividing the other eight challenged circuits into subdistricts. Federal courts have implemented subdistricting as a remedy in the judicial election context. See Lopez v. Monterey County, Cal., 871 F.Supp. 1254 (N.D.Cal.1994); Clark v. Roemer, 777 F.Supp. 471 (M.D.La.1991); Martin v. Mabus, 700 F.Supp. 327 (S.D.Miss.1988). Nonetheless, the majority rejects this alternative, arguing that it would: (1) defeat Alabama's interest in having judges accountable to the entire circuit for which they serve; and (2) unduly pressure judges to favor constituents in their subdistricts. The fallacy of such arguments has been well documented. See Nipper, 39 F.3d at 1557-58 (Hatchett, J., dissenting); LULAC, 999 F.2d at 918-21 (King, J., dissenting). Some points, however, bear elaboration.
 
 
 159
 The majority asserts that in order to maintain judicial accountability, an Alabama court's territorial jurisdiction must be linked to its electorate. The majority does not clearly explain how this linkage actually enforces judicial accountability, but essentially indicates that such accountability is fostered if the litigants that appear before a judge also have the ability to vote for that judge. This argument, however, suffers from a fundamental flaw--an Alabama court's jurisdiction has nothing to do with the electoral territory that it represents. While certain geographical boundaries determine the electoral bases of Alabama judges, these same boundaries do not limit the kinds of cases the judges hear, nor do they limit what litigants will appear before the judges. Instead, Alabama's circuit courts are courts of general jurisdiction; thus, their judicial jurisdiction is defined in terms of subject matter, not electoral geography. See Ala. Const. amend. 328, Sec. 6.04(b); Ala.Code Sec. 12-11-30 (1993). These constitutional and statutory provisions have nothing to do with the legislative decisions involved in the construction of Alabama's electoral boundaries.
 
 
 160
 Thus, although the majority characterizes the state's interest as linking a trial court's jurisdiction to its electorate, the linkage argument really involves venue. See LULAC, 999 F.2d at 918-19 (King, J., dissenting). But, the "reality is that [Alabama's] venue rules do not, and were not meant to, ensure the accountability of judges." LULAC, 999 F.2d at 919 (King, J., dissenting). Under Alabama's venue rules, trial judges may often hear civil cases in which none of the litigants are members of their constituencies. See, e.g., Ala.Code Sec. 6-3-2(a)(1) (1993) (actions to recover land "must be commenced in the county where the land or a material part thereof lies"); Ala.Code Sec. 6-3-2(a)(3) (1993) ("[P]ersonal actions ... may be commenced ... in the county in which the act or omission complained of may have been done or may have occurred."); Ala.Code Sec. 6-3-2(b)(1) (1993) ("All actions where real estate is the subject matter of the action ... must be commenced in the county where the same or a material portion thereof is situated."); Ala.Code Sec. 6-3-3 (1993) ("In all actions for work and labor done or breaches of contracts or covenants as to easements or rights-of-way, the action may be commenced in the county in which the work was done or in which the land is situated as to which the easement or right-of-way was granted."); Ala.R.Civ.P. 12(h) (allowing for the waiver of geographical venue restrictions). In criminal cases, "the venue of all public offenses is in the county in which the offense was committed." Ala.Code Sec. 15-2-2 (1982). Thus, criminal defendants will often appear before judges for whom they did not have the opportunity to vote.
 
 
 161
 Likewise, under other provisions of the Alabama Code, trial judges frequently preside over non-constituents. For example, the Alabama chief justice may assign judges to hear cases outside of their own circuits "[w]henever the public good requires." Ala.Code Sec. 12-2-36 (1993). Alabama law also allows the chief justice to call retired judges for "temporary active duty in any court." Ala.Code Sec. 12-18-61 (1993). Statistics for the 1990 court year show that the chief justice invokes these provisions regularly.[17] In 1990, sixty-two circuit judges, fifty district judges, and twenty-seven retired judges heard cases in courts in which they were not elected to serve. In addition, retired judges have routinely accepted part-time assignments in the circuit courts of the Tenth and Thirteenth Circuits, and the district courts in Jefferson and Mobile counties. As Alabama concedes in its 1990 judicial report: "Additional judge services, provided by active trial judges accepting out-of-circuit assignments and retired judges on active duty, provide direct benefits to the Alabama judiciary and the people of this state by helping to ensure that the dockets of courts throughout the state remain current."
 
 
 162
 In short, the majority fears that subdistricting will eliminate judicial accountability because judges may often preside over litigants who did not have the opportunity to vote for them. In Alabama, however, this happens all of the time. While I concede that under a subdistricting plan, trial judges may hear more cases involving non-constituents, I do not believe that this increase is significant in view of the large number of non-constituent cases already being heard. Essentially, the majority must believe that the current number of non-constituent cases does not inhibit judicial accountability, but that adding more of such cases under a subdistricting plan would somehow violate a magical threshold, thereby reducing judicial accountability to an impermissible degree. After considering the current number of non-constituent cases in Alabama's system, however, I can only conclude that subdistricting is an alternative remedy "within the confines of the state's judicial model." Nipper, 39 F.3d at 1531. Furthermore, the increased number of non-constituent cases that may result will "not undermine the administration of justice." Nipper, 39 F.3d at 1531.
 
 
 163
 The majority also contends that subdistricting will "undermine the administration of justice" in another respect: it believes that "small" subdistricts will lead to "home cooking" and race-based justice because trial judges will succumb to pressure to favor their constituents. The majority's fears have no basis in the record. At trial, witnesses involved with the Martin subdistricting plan implemented in Mississippi testified that "home cooking" played no part in their judicial system. Furthermore, the record shows that the smallest subdistrict proposed would have a population of 22,754; twenty-one of the sixty-seven counties in Alabama, each with a separate district court, have smaller populations. Since "home cooking" is not a problem in these present counties, it should not be a problem in more populous subdistricts. Finally, the record shows that majority black counties in Alabama have elected four black probate judges. Nobody has alleged that these judges engage in "home cooking" or race-based justice.
 
 
 164
 The majority's argument "is, at bottom, a smokescreen: It suggests that [trial] judges who are elected by white majorities ... are responsive to the needs of all voters in the county--including minority voters. Yet it assumes that a judge elected from a majority-[black] district would somehow be less willing to follow his or her oath or to be responsible to the needs of all." LULAC, 999 F.2d at 919-20 (King, J., dissenting). Unlike the majority, I believe that black judges elected from majority black subdistricts will carry out their duties in conformity with Alabama's Canons of Judicial Ethics. In sum, I find it "rather offensive to conclude that the impartiality of judges will somehow become tainted when elected from subdistricts that permit minority voters to elect their preferred candidates." Nipper, 39 F.3d at 1558 (Hatchett, J., dissenting).
 
 3. Cumulative Voting
 
 165
 Implementation of a cumulative voting scheme to remedy a section 2 violation is not without precedent. See Cane v. Worcester County, Md., 874 F.Supp. 687 (D.Md.1995). In footnote 24, the majority implies that because the appellants have not proposed cumulative voting, this court need not consider such an alternative. Under section 2, however, courts have a duty to consider all potential remedies, not just those that the parties propose.
 
 
 166
 The majority states that even if the appellants had advocated cumulative voting, such a scheme would not be feasible because it would have "invidious effects ... on the collegiality of the court as well as on lawyer interest in a judicial career." Both of these conclusions are seriously flawed.
 
 
 167
 First, it is outrageous to suggest that the collegiality of judges somehow constitutes a state interest that outweighs the need to remedy a section 2 violation. Alabama has an interest in having professional, not collegial, judges. Even assuming the notion that such "judicial bonding" is a legitimate state interest, concerns about it here are entirely misplaced. Alabama circuit and district judges are not members of multi-judge appellate panels; if they were, the state would possibly have a basis to make this collegiality argument. Instead, the judgeships at stake in this case are trial positions--circuit and district judges sit alone and run their own courtrooms. Therefore, in this instance, the state has no interest in judicial collegiality.
 
 
 168
 Even assuming, for the moment, that a state has an interest in fostering collegiality among its trial judges, such collegiality would not be sacrificed under a cumulative voting system. The majority's concern seems to be that collegiality will be sacrificed because judges will be forced to run against each other in elections. The majority's reasoning, however, is trapped in the paradigm of numbered-place election systems. Under a cumulative voting system, candidates do not run against each other in the typical "head-to-head" format of a numbered-place system. Instead, candidates run for several positions. As a result, candidates need not defeat all of their opponents to win an office. In addition, because of the increased number of participants, a candidate's opposition is less centralized. As such, self-promotion, as opposed to negative campaigning, is the wise campaign strategy under a cumulative voting system. See Linda Maguire, An Interview with Lani Guinier, 19 Fletcher Forum of World Affairs 99 (1995) ("[I]t is much harder to engage in negative campaigning when you run against five or six people than when you run against just one, because at some level you have to give voters an affirmative reason to vote for you, as opposed to just not voting for the other candidate."); Lani Guinier, The Representation of Minority Interests: The Question of Single-Member Districts, 14 Cardozo L.Rev. 1135, 1137 (1993) ("[N]egative campaigning is less effective in elections with multiple winners than in elections with only one opponent."). Accordingly, cumulative voting systems breed less contentious elections.
 
 
 169
 Moreover, ethical codes dictate that judicial candidates should abstain from egregious negative campaigning. Canon 7 of the Alabama Canons of Judicial Ethics provides that judicial candidates "[s]hould maintain the dignity appropriate to judicial office" while campaigning. Canon 7 also states that a judicial candidate: "Should not make pledges or promises of conduct in office other than the faithful and impartial performances of the duties of the office; should not announce and advance his conclusions of law on pending litigation; and should not misrepresent his identity, qualifications, present position or other fact." Because of these restrictions, judicial elections should be less contentious than elections for legislative or executive governmental positions.
 
 
 170
 The majority's second problem with cumulative voting is that it will discourage lawyers from running for judgeships. The majority does not explain its reasoning, and I do not find it self-evident. Chief Judge Tjoflat, however, made the same argument in Nipper, explaining that lawyers will be deterred from running for office under a cumulative voting system because: (1) if victorious, they will have to begin running for reelection from the moment they take office; (2) they will have to compete against every judge up for reelection; and (3) the power of incumbency will no longer ensure retention in office. See Nipper, 39 F.3d at 1546.
 
 
 171
 I do not understand the reasoning behind the first proposition. I see no reason why judges would have to engage in longer reelection campaigns under a cumulative voting system. In fact, campaigning under a cumulative voting system should be less time consuming. As explained, cumulative voting systems foster campaign strategies of self-promotion and thus do not encourage the additional burden of negative campaigning. Moreover, Alabama trial judges serve lengthy terms--circuit and district judges are elected to a six-year tenure. See Ala. Const. amend. 328, Sec. 6.15 (1973). It remains unclear to me why judges would need six years to run for re-election under a cumulative voting scheme.
 
 
 172
 Chief Judge Tjoflat's second and third reasons are contradictory. The second reason states that lawyers will not run for judicial office under a cumulative voting system because they will be faced with the onerous task of having to defeat multiple incumbent judges. The third reason, however, states that the power of incumbency dissipates under a cumulative voting system. Putting this contradiction aside, neither proposition stands on its own merit; both seem concerned with cumulative voting generating increased competition for achieving and retaining judgeships. I do not view increased competition for judicial positions as a negative. In my view, a more competitive process will produce better, more dedicated, judges. In fact, this is the strength of a cumulative voting scheme.
 
 
 173
 C. Applying the Totality-of-the-Circumstances Prong
 
 
 174
 Although the appellants have made a strong showing of vote dilution under the Gingles factors, their case becomes even more compelling after considering the relevant factors in the totality-of-the-circumstances prong. Indeed, six Senate Report factors strongly weigh in favor of a finding of vote dilution.
 
 
 175
 1. Extent Blacks Have Been Elected to Public Office
 
 
 176
 The most important Senate Report factor is the extent to which blacks have been elected to public office. As has already been detailed, only one black lawyer has ever first attained a circuit or district judgeship through election in the ten challenged circuits. That victorious candidate ran unopposed. Of the eighty-four contested judgeship positions, blacks only fill six; all six judges were appointed.
 
 
 177
 In the ten challenged circuits, black electoral success has largely been limited to single-member districts and majority black counties.[18] In 1991, ninety-three percent of black office holders in the counties at issue represented single-member districts or majority black counties. Only six black officials, including five initially appointed to office, served at-large in majority white counties. Of the 213 total officials who served at-large in the majority white counties at issue, 97 percent were white.
 
 2. History of Voting-Related Discrimination
 
 178
 The parties stipulated to the sad history of voting-related discrimination in Alabama. For the sake of brevity, I will relate a mere sampling of this history, and will only begin the chronology after the passage of the Fifteenth Amendment.
 
 
 179
 In 1893, the Alabama Legislature passed the Sayre Law, a complex election statute specifically intended to disfranchise blacks. The Alabama Legislature, however, was not satisfied, and, at its 1901 constitutional convention, passed a full host of voter qualifications specifically intended to disfranchise the black citizens of Alabama. The following year, the Alabama Democratic Party limited the right to vote in its primary to white males.
 
 
 180
 After the Supreme Court outlawed white primaries in 1944, Alabama adopted the Boswell Amendment, which required an applicant for the franchise to demonstrate a satisfactory understanding of a section of the United States Constitution. The intent of the Boswell Amendment was to discriminate against applicants on the basis of race. Then, in 1951, Alabama amended its constitution to restrict voter registration to those who could read and write an article of the United States Constitution, and were of "good character."
 
 
 181
 In 1957, the Alabama Legislature changed the boundaries of the city of Tuskegee from a four-sided square to a twenty-eight-sided configuration in order to remove black voters from the city. In the same year, the Alabama Legislature, with a discriminatory intent, established a committee to abolish Macon County, whose population was ninety percent black. While the state of Alabama took these discriminatory measures as a whole, individual public officials continuously engaged in a pattern of harassment, intimidation, and brutality against blacks attempting to register to vote.
 
 
 182
 In 1965, before Congress enacted the Voting Rights Act, the Alabama Legislature adopted a resolution which implored its representatives in Washington to oppose the federal legislation. After Congress passed the Act, intimidation against blacks attempting to register continued. In some instances, officials engaged in a pattern of baseless arrests of prominent black leaders as a means of intimidating black citizens from registering. Also in 1965, in an effort to exclude blacks from participating in state government, the Alabama Legislature passed a racially gerrymandered reapportionment scheme. Until 1966, Alabama required its citizens, with the specific intent of disfranchising black voters, to pay a poll tax. Finally, as late as 1984, blacks were underrepresented as poll officials.
 
 3. Typical Discriminatory Voting Practices
 
 183
 The third Senate Report factor asks whether the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices that may enhance the opportunity for discrimination against a minority group. The at-large, numbered place, and majority vote requirements in the challenged circuits and districts constitute the type of election system that this Senate Report factor contemplates as enhancing the opportunity for discrimination.
 
 
 184
 It is important to note that this Senate Report factor simply considers whether the state has used "voting practices or procedures that may enhance the opportunity for discrimination against the minority group." S.Rep. No. 417, at 29, reprinted in 1982 U.S.C.C.A.N. at 206 (emphasis added). Thus, this Senate Report factor is simply concerned with the potential effects of the voting practices; it does not ask whether the state has implemented its voting procedures with a discriminatory intent. In his concurrence, Judge Edmondson seems to believe, mistakenly, that the totality-of-the-circumstances prong requires an inquiry into a state's intent in implementing its voting system. Such an inquiry may be determinative of a constitutional challenge, but is clearly not essential to a section 2 challenge. See Chisom, 501 U.S. at 384, 111 S.Ct. at 2358 ("In 1982, Congress amended Sec. 2 of the Voting Rights Act to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.") (footnote omitted); Nipper, 39 F.3d at 1548-56 (Hatchett, J., dissenting) (detailing Supreme Court precedent and the Act's legislative history in response to the assertion that the totality-of-the-circumstances prong requires a showing of discriminatory intent in the voting community); Pamela S. Karlan, All Over the Map: The Supreme Court's Voting Rights Trilogy, 1993 Sup.Ct.Rev. 245, 250-51 ("Originally, the liability standard under the Voting Rights Act dovetailed with the constitutional standard. But in 1982 the Act was amended to eliminate the requirement that plaintiffs show a discriminatory purpose; proof of a dilutive effect is enough.").[19]
 
 
 185
 In fact, the appellants challenged the at-large, numbered place system for electing judges on equal protection grounds in the district court, alleging that Alabama has maintained it for discriminatory reasons. The district court rejected their claim. Even though the appellants have not appealed that decision, this may be why the majority and Judge Edmondson feel compelled to note that "there was no evidence that the at-large, majority vote, and numbered place requirements were instituted or are being maintained for discriminatory purposes." As I have stated, this fact is, for the most part, irrelevant to the holding of this case. Nonetheless, I am compelled to respond to the assertion that this record is without any evidence of Alabama's discriminatory intent.
 
 
 186
 The parties stipulated to the following facts: From 1876 to 1976, Mobile County employed a numbered place, at-large system to elect its board of school commissioners in order to discriminate against blacks and to deny them access to political office. Similarly, from 1911 to 1982, the city of Mobile operated under a commission form of government, which employed a numbered place, at-large system; the adoption and maintenance of this system was racially motivated. In 1957, the Montgomery County Commission adopted a numbered place, at-large election system for the purpose of diluting black voting strength and keeping blacks out of office.[20]
 
 
 187
 While this evidence does not directly show that Alabama has maintained its at-large, numbered place system of electing judges in order to discriminate against blacks, I find it highly persuasive. It is hard to imagine that Alabama's motivation for maintaining its at-large, numbered place system of electing judges is completely innocent, while entities throughout the state have implemented and maintained such systems for discriminatory purposes. In short, it is obvious that Alabama "has used voting practices and procedures meant to discriminate against the African-American community"--the same voting practices and procedures that it uses to elect judges. White, 867 F.Supp. at 1556.
 
 
 188
 4. Discrimination in Education, Employment, and Health
 
 
 189
 "[B]lacks in Alabama have suffered from the state's discrimination in all aspects of their lives." White, 867 F.Supp. at 1555. The parties stipulated to Alabama's discriminatory history in the area of health. For example, until the late 1960s, Alabama's mental health facilities were segregated, and those that serviced blacks were often inferior. The parties also stipulated to Alabama's long history of discriminating against blacks in employment. For example, until 1972, the Alabama Department of Public Safety refused to hire black state troopers. Although Alabama was prohibited from further employment discrimination in the early 1970s, its progress in employing blacks was minimal. As late as 1976, the state continued to use invalidated examinations that screened out disproportionate numbers of black applicants.
 
 
 190
 Most relevant to this case, however, is Alabama's long history of educational discrimination. Until the 1960s, Alabama maintained a segregated school system. Also until the 1960s, the University of Alabama School of Law, the only state-supported law school, refused to admit black applicants. The first black law student enrolled in 1964, but no black students enrolled thereafter until 1968. The first black law student was graduated in 1972.
 
 
 191
 In conducting the vote dilution inquiry, the district court repeatedly explained that the shortage of black judges was due to a shortage of black lawyers; the district court even implied that, when considering the number of black lawyers, blacks are overrepresented on the bench. SCLC, 785 F.Supp. at 1476-77, 80-87. "First, in assessing the extent to which minority candidates have been elected to public office, the appropriate comparison pool has always been the number of minorities in the population[,]" not the number of potential candidates. LULAC, 999 F.2d at 913 (King, J., dissenting); see also White, 867 F.Supp. at 1562 ("Section 2 is concerned with the political opportunities of 'members of the electorate.' The Act was not passed to protect the rights of candidates.") (quoting 42 U.S.C. Sec. 1973(b)). More importantly, however, the district court turned Alabama's discrimination against blacks in the field of education--which is supposed to weigh in favor of a finding of vote dilution--on its head; instead of using this factor as a sign of vote dilution, the district court did just the opposite. See LULAC, 999 F.2d at 913 (King, J., dissenting) ("the comparative lack of minority lawyers constitutes evidence of the lingering socio-economic effects of discrimination, which argues in favor of a vote dilution finding"). Thus, the district court could not have applied this factor more incorrectly. In sum, the district court's reasoning wrongly suggests that "blacks are somehow responsible for their own plight--i.e., for their persistent low enrollment in law school." LULAC, 999 F.2d at 913 (King, J., dissenting).
 
 5. Racial Appeals in Political Campaigns
 
 192
 Appellants presented evidence of campaigns in which white judicial candidates, who were facing black opponents, made racial appeals. These candidates ran the pictures of their black opponents in newspapers.[21] The district court found that these racial appeals were insignificant because the black candidates eventually won their elections. This Senate Report factor, however, does not ask whether the racial appeals were successful; it simply asks whether they were made, and, in this case, they were made.
 
 6. Alabama's Tenuous Interests (Revisited)
 
 193
 Finally, I have already assessed Alabama's interests in maintaining its judicial system when I applied the first and second Gingles factors in part III(B). Although I recognize this court's requirement that I once again weigh the state's interests, my assessment has not changed since part III(B). All of Alabama's interests in maintaining its current judicial system are tenuous. Thus, this factor actually weighs in favor of a finding of a section 2 violation.
 
 IV. Conclusion
 
 194
 I have engaged in this exhaustive and repetitive analysis because one of the major shortcomings of the majority's opinion is that it fails to rigorously apply the law of this circuit, and the relevant facts to that law. After engaging in this step-by-step analysis, it becomes apparent that the appellants have shown racially polarized voting, and, ultimately, a section 2 violation. Because I believe that recircuiting, subdistricting, and cumulative voting are feasible remedies for this violation, I respectfully dissent.
 
 APPENDIX
 UNITED STATES DISTRICT COURT
 FOR THE MIDDLE DISTRICT OF
 ALABAMA
 NORTHERN DIVISION
 Civil Action No. 88-H-462-N
 
 195
 Filed Dec. 9, 1991.
 
 
 196
 SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF ALABAMA, et al.,
 
 
 197
 Plaintiffs,
 
 
 198
 v.
 
 
 199
 JAMES H. EVANS, et al., Defendants.
 
 STIPULATIONS
 
 200
 (Revised 12/9/91)
 
 
 201
 35. The Alabama Code of 1876 restricted the testimony of blacks to those cases where freedmen, free negroes, or mulattoes were parties; cases where the injury was to freemen, free negroes or mulattoes; or where a freedman, free negro or mulatto was a witness against a white person or vice versa. See Ala.Acts, 1865-1867, p. 98; repealed by Ala.Code, 1967, Sec. 10.
 
 
 202
 36. For many years, Alabama systematically excluded blacks from grand and petit juries. See Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Patterson v. Alabama, 294 U.S. 600, 55 S.Ct. 575, 79 L.Ed. 1082 (1935); Rogers v. Alabama, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904); Black v. Curb, 464 F.2d 165 (5th Cir.1972); Seals v. Wiman, 304 F.2d 53 (5th Cir.1962); White v. Crook, 251 F.Supp. 401 (M.D.Ala.1966) (three-judge court); Mitchell v. Johnson, 250 F.Supp. 117 (M.D.Ala.1966).
 
 
 203
 37. Alabama courtrooms were at times segregated. See "Judge Jones on Courtroom Segregation," The Alabama Lawyer, Vol. 22 No. 2 (April 1961), at p. 190.
 
 
 204
 38. Alabama law required the jails and prisons to be segregated until the late 1960's. See Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966) (three-judge court), aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1967 [1968].
 
 
 205
 39. In a joint resolution commending Governor Wallace "for his prompt action in dispatching the Alabama highway patrol and other law enforcement officers to Birmingham to quell the mob violence in that city," the Legislature also stated that "the executive branch of the federal government has long assumed a policy of tacit encouragement and active support of irresponsible racist agitators sent into this state to defy our laws and to deliberately inflame unstable emotions into frenzied, savage,
 
 
 206
 [End of page 1]
 
 
 207
 racial violence...." Ala.Acts 1963, pp. 387, 386. In a commendation to the state public safety director and the state highway patrol, the Legislature characterized the disturbance as "depredations upon persons and property incited by trained out of state racist agitators." Ala.Acts.1963, p. 388.
 
 
 208
 40. Until 1972, the Alabama Department of Public safety refused to hire black state troopers. See Paradise v. Prescott, 585 F.Supp. 72 (M.D.Ala.1983), aff'd, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).
 
 
 209
 41. After the court ordered the trooper force to be integrated, the State failed to implement a promotion plan that did not have a disparate impact on blacks until at least 1987. See United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).
 
 
 210
 42. The Sayre Law, a complex election statute passed in 1893, was expressly designed to legally eliminate blacks from politics in Alabama. "Black voter turnout statistics after 1892 showed that the Sayre Law substantially accomplished its goal of disfranchisement; black participation in terms of voter turnout dropped by twenty-two percent (22%) from 1892 to 1894 and thereafter remained below fifty percent (50%)." See Bolden v. City of Mobile, Alabama, 542 F.Supp. 1050, 1062 (M.D.Ala. [S.D.Ala.] 1982).
 
 
 211
 43. In 1901, the Alabama Legislature passed an act calling for a constitutional convention in order to permanently restrict state suffrage rights. The primary purpose of the all-white 1901 constitutional convention was to disfranchise the black and poor illiterate white electorate and to remove blacks and poor illiterate whites completely from the political process. The 1901 convention produced a full host of voter qualifications that immediately disfranchised almost every black citizen of Alabama. See Dillard v. Crenshaw County, 640 F.Supp. 1347, 1358 (M.D.Ala.1986); Bolden v. City of Mobile, Alabama, 542 F.Supp. 1050, 1062 (M.D.Ala. [S.D.Ala.] 1982).
 
 
 212
 44. From 1901 to 1966, Alabama required persons to pay a poll tax in order to vote in any election. The purpose and effect of the poll tax was to disfranchise black voters. Additionally, for those blacks with the ability to pay the poll tax, a greater burden of compliance was placed on them than on whites. See United States v. Alabama, 252 F.Supp. 95 (M.D.Ala.1966) (three-judge court).
 
 
 213
 45. In 1902 the Alabama Democratic Party limited the right to vote in the Democratic primary to white males who pledged to support the nominees of the Democratic Party. Minutes of the 7/10/02 Democratic State Executive Committee. See Alabama Democratic Party Minutes, Book 5, p. 67, Alabama Department of Archives and History, Range H, Section 3, Shelf A, Box 1.
 
 
 214
 46. After the U.S. Supreme Court outlawed white primaries in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the State of Alabama
 
 
 215
 [End of page 2]
 
 
 216
 adopted the Boswell Amendment which required an applicant for the franchise to demonstrate a satisfactory understanding of a section of the Constitution of the United States. The Amendment was intended to be and was used for the purpose of discriminating against applicants on the basis of race. As of March 1, 1948, the Mobile County Board of Registrars had registered 2800 whites and 104 blacks. See Davis v. Schnell, 81 F.Supp. 872, 876, (S.D.Ala.1949) (three-judge court), aff'd 336 U.S. 932 , 69 S.Ct. 749, 93 L.Ed. 1093 (1950 [1949].
 
 
 217
 47. Amendment 91 of the Alabama Constitution (adopted in 1951) allowed registration only of those who could read and write any article of the U.S. Constitution in the English language, were of "good character," and "who embrace the duties and obligations of citizenship." Boards of registrars were declared to be judicial officers. The Alabama Supreme Court was required to prepare questionnaires to be used by local registrars.
 
 
 218
 48. The Alabama Supreme Court promulgated a four-page questionnaire that required the applicant to write their name ten times in answer to several questions, explain their business or employment background three times, answer two different questions regarding length of residence in several places, and give their spouse's place of birth. See U.S. Commission on Civil Rights, Voting: Hearings held in Montgomery, December 8-9, 1958, and January 9, 1957 (1959), pp. 17-20.
 
 
 219
 49. Ala. Const., Amend. 223 (proposed Amendment No. 2 adopted in 1965), required applicants for voter registration to demonstrate the ability to read and write English. The voters approved the amendment by a margin of 93,647 to 37,137 with a majority in favor in every county. See ADAH, Alabama Official and Statistical Register 1967, pp. 687-88, 707-9.
 
 
 220
 50. On March 23, 1965, the United States Senate began public hearings on the legislation that became enacted as the Voting Rights Act of 1965. "On the day before [these hearings began], March 22, 1965, the Alabama Legislature adopted a resolution condemning 'outside agitators, communist sympathizers, and well meaning, but socially ignorant crusaders, [who have] skillfully laid the ground work for such a vicious piece of legislation by stirring up strife and dissension in this area in particular and throughout this country generally.' The resolution implored Alabama's congressional delegation in Washington 'to use every effort and all means available to prevent this vicious proposal from being presented to Congress, and to redouble their efforts to defeat it if it is so introduced.' " See Hale County v. United States, 496 F.Supp. 1206, 1210 (D.C.D.C.1980) (three-judge court) (quoting Act No. 98, 1965 Ala.Acts 112).
 
 
 221
 51. Prior to the passage of the Voting Rights Act, some public officials in Alabama engaged in a pattern of harassment, intimidation, and brutality against blacks attempting to register
 
 
 222
 [End of page 3]
 
 
 223
 to vote. See Williams v. Wallace, 240 F.Supp. 100, 104 (M.D.Ala.1965).
 
 
 224
 52. At least until 1960, the state and many county registrars offices, including Dallas, Macon, Montgomery, Perry, and Wilcox Counties, deliberately and consistently engaged in procedures and practices which favored white applicants to vote and discriminated against black applicants. See United States v. Atkins, 323 F.2d 733 (5th Cir.1963) (Dallas); United States v. Parker, 236 F.Supp. 511 (M.D.Ala.1964) (Montgomery); United States v. Mayton, 335 F.2d 153 (5th Cir.1964) (Perry); Alabama v. United States, 304 F.2d 583 (5th Cir.1964 [1962] (Macon); United States v. Logan [Logue ], 344 F.2d 290 (5th Cir.1965) (Wilcox).
 
 
 225
 53. After the passage of the Voting Rights Act, intimidation against blacks attempting to register to vote continued. In Dallas County, for example, officials engaged in a pattern of baseless arrests and prosecutions of prominent black leaders as a means of intimidating black citizens from registering. See United States v. McLeod, 385 F.2d 734 (5th Cir.1967); see also Clark v. Boynton, 362 F.2d 992 (5th Cir.1966).
 
 
 226
 54. In an effort to exclude blacks from participating in state government, the Alabama Legislature, in 1965, passed a racially gerrymandered reapportionment scheme for the state legislature. The unconstitutional plan included the combination of Macon, Elmore, and Tallapoosa Counties into one district and Bullock, Pike, Coffee, and Geneva into another. The purpose of these two particular groupings was to dilute the black votes of Macon and Bullock Counties. See Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965).
 
 
 227
 55. On August 7, 1965, the State of Alabama was certified by the Attorney General of the United States, as a state subject to the provisions of the Voting Rights Act of 1965. Several days later, the Attorney General certified in accordance with Section 6 of the Act that the appointment of federal examiners for Lowndes, Marengo, Perry, and Wilcox Counties was necessary to enforce the guarantees of the Fifteenth Amendment. See Sims v. Baggett, 247 F.Supp. 96, 108 (M.D.1965).
 
 
 228
 56. At least until 1984, there was an under-representation of black poll officials. One county with a substantial black population (26.2%) had no black poll officials. Among poll officials, disproportionately few blacks served as chief inspector, chief clerk, and returning officer. See Harris v. Graddick, 593 F.Supp. 128, 131-32 (M.D.Ala.1984).
 
 
 229
 57. At least until 1980, strong racially polarized voting existed in Hale County, Alabama. See Hale County, Alabama v. United States, 496 F.Supp. 1206, 1213 (D.C.D.C.1980) (three-judge court).
 
 
 230
 [End of page 4]
 
 
 231
 58. In 1965, the form of election system for Hale County Commissioners was changed from single member districts to an at-large election system (with sub-district residency requirements). See Hale County, Alabama v. United States, 496 F.Supp. 1206, 1216 (D.C.D.C.1980) (three-judge court).
 
 
 232
 59. From 1876 to 1976, Mobile County elected its Board of School Commissioners by a numbered place, at-large election system. The purpose of this system and its effect was to discriminate against blacks and to deny them access to the political process and political office. See Brown v. Board of School Commissioners of Mobile County, Alabama, 706 F.2d 1103, 1107 (11th Cir.), aff'd, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983).
 
 
 233
 60. From 1911 to 1982, the City of Mobile operated under a commission form of government elected by a numbered place, at-large system. The adoption and maintenance of this system was racially motivated. See Bolden v. City of Mobile, Alabama, 542 F.Supp. 1050 (M.D.Ala. [S.D.Ala.] 1982).
 
 
 234
 61. At least until 1982, racially polarized voting occurred in Mobile County. See Brown v. Board of School Commissioners of Mobile County, Alabama, 542 F.Supp. 1078, 1091 (S.D.Ala.1982), aff'd, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983); Bolden v. City of Mobile, Alabama, 542 F.Supp. 1050, 1062 (M.D.Ala. [S.D.Ala.] 1982).
 
 
 235
 62. After black members were elected to the Mobile County Board of School Commissioners, the School Board changed the powers of the Commissioners so as to enhance the voting power of the white commissioners. This change was intended to dilute black voting strength. See Brown v. Board of School Commissioners of Mobile County, Alabama, 542 F.Supp. 1078, 1107 (S.D.Ala.1982), aff'd, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983).
 
 
 236
 63. Act 685, passed in 1957, instituted a numbered place, at-large election system for the Montgomery County Commission. The purpose and effect of this system was to dilute black voting strength and to keep blacks from being elected to office. See Hendrix v. McKinney, 460 F.Supp. 626, 630 (M.D.Ala.1978).
 
 
 237
 64. At least until 1978, voting in Montgomery County was, to a substantial degree, polarized by race. See Hendrix v. McKinney, 460 F.Supp. 626, 630 (M.D.Ala.1978).
 
 
 238
 65. In 1983, the City of Montgomery enacted a plan for the City Council that reduced the black voting age population in one district. The purpose of the plan was to dilute the voting strength of blacks in that district. See Buskey v. Oliver, 565 F.Supp. 1473 (M.D.Ala.1983).
 
 
 239
 66. At least until 1975, blacks in the City of Dothan in Houston County were excluded from every phase of the local[End of page 5]
 
 
 240
 political process. See Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974).
 
 
 241
 67. The at-large election system (with sub-district residency requirements) for the Dothan City Commissioners had the effect of diluting the political power of blacks in the city. See Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974).
 
 
 242
 68. In 1957, the Alabama Legislature enacted Local Act No. 140, redefining the boundaries of the City of Tuskegee in Macon County. The purpose of the act, which changed the boundaries from a four-sided square to a twenty-eight-sided configuration, was to remove from the City all but four or five 400 black voters. Not a single white voter or resident was removed by the change. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).
 
 
 243
 69. In 1957, the Alabama Legislature established a committee to abolish Macon County, whose population was 90 percent black. The purpose of this committee "was to maintain segregation." The Committee's creation was consistent with the notion that "[o]nly merging Macon County into the surrounding counties ... would preclude blacks from being elected to public office, including the Macon County Commission." See Hendrix v. McKinney, 460 F.Supp. 626, 628 (M.D.Ala.1978).
 
 
 244
 70. From 1956 to 1964, the Attorney General of Alabama and the Alabama Supreme Court attempted to exclude the NAACP from operating in Alabama. The NAACP was encouraging black citizens to assert their constitutional rights and to protest against segregation. See NAACP v. Alabama, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).
 
 
 245
 71. Until the 1960's, Alabama maintained a segregated school system. The education opportunities accorded to black students were inferior to opportunities accorded to white students. See Lee v. Macon County Board of Ed., 231 F.Supp. 743 (M.D.Ala.1964) (three-judge court).
 
 
 246
 72. Deleted by agreement.
 
 
 247
 73. Until the 1960's, the University of Alabama School of Law (the only state supported law school in Alabama) had a practice of refusing admission to black applicants. The first black student to enroll in the University of Alabama School of Law enrolled in 1964. There were no black students enrolled during the school years 1965 through 1968. The first black law student to graduate graduated in 1972.
 
 
 248
 74. For most of this century, blacks were excluded from public parks, see Gilmore v. City of Montgomery, 176 F.Supp. 776 (M.D.Ala.1959), modified, 277 F.2d 364 (5th Cir.1960), recreational facilities, see Smith v. Y.M.C.A., 316 F.Supp. 899 (M.D.Ala.), aff'd as modified, 462 F.2d 634 (5th Cir.1970 [1972];
 
 
 249
 [End of page 6]
 
 
 250
 Faulkner v. City of Gadsden, 9 Race Rel.L.Rep. 876 (1964), public libraries and museums, see Cobb v. Montgomery Library Board, 207 F.Supp. 880 (M.D.Ala.1962), and public golf courses, See Sawyer v. City of Mobile, 208 F.Supp. 548 (S.D.Ala.1961).
 
 
 251
 75. Until the late 1960's, Alabama mental health facilities were segregated, and those that serviced blacks were often inferior. See Marable v. Alabama Mental Health Board, 297 F.Supp. 291 (M.D.Ala.1969) (three-judge court).
 
 
 252
 76. Until the early 1960's, Alabama law required most forms of public transportation to be segregated. See United States v. City of Montgomery, 201 F.Supp. 590 (M.D.Ala.1962) (municipal airport facilities); Lewis v. Greyhound Corp., 199 F.Supp. 210 (M.D.Ala.1961) (bus terminals); Browder v. Gayle, 142 F.Supp. 707 (M.D.Ala.) (three-judge court), aff'd mem., 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (city buses).
 
 
 253
 77. The State of Alabama has a long history of discriminating against blacks in employment. See United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970). Although the state was prohibited in 1970 from further discrimination, its progress in employing blacks was minimal and, at many state agencies, nonexistent as late as 1976. See United States v. Frazer, 14 Empl.Prac.Dec. (CCH) p 7599 at 4933, 1976 WL 729 (M.D.Ala.1976). As late as 1976, the state continued to use invalidated examinations that screened out disproportionate numbers of black applicants. Id., at 4931.
 
 
 254
 78. Alabama law, until 1975, defined race. Ala.Code, 1907, p. 218, Section 2 provided: "The term 'negro' within the meaning of this Code includes mulatto. The term 'mulatto,' or 'person of color,' ... is a person of mixed blood, descended on the part of the father or mother from negro ancestors, to the fifth generation inclusive, though one ancestor of each generation may have been a white person." (The fifth generation was substituted for the third generation by the Code Committee of the 1907 Code. Prior to this, the third generation was the term used in the laws.) Ala.Laws, 1927, p. 716, redefined mulatto to include a person descended "from negro ancestors, without reference to or limit of time or number of generations removed." The recodification of this section, Ala.Code, tit. 1, Sec. 2 (1940), includes the following Note:
 
 
 255
 Prior to 1927 a person was a "negro" if descended on the part of the father or mother from negro ancestors, to the fifth generation inclusive, although one ancestor may have been a white person. See Code 1923, Sec. 2(5). At this time there was a great diversity among the states as to the legal definition of a "negro," which resulted in the regrettable situation of a person today being legally a white person, and tomorrow after a short
 
 
 256
 [End of page 7]
 
 
 257
 migration, being legally a colored person. In 1927, the legislative bodies of a great many states, working along with same line, amended their statutes so as to define the term as defined in the instant section. This definition, while a strict one, has the advantage of being sure and uniform.
 
 
 258
 Ala.Code, 1975, Sec. 1-1-10 eliminated the word "Negro" from its definitions.
 
 
 259
 79. After the passage of the Civil Rights Act of 1957, some state and local officials in Alabama resisted efforts by the federal government to investigate possible violations of the Act. Oftentimes, the United States had to resort to federal court to subpoena witnesses and records from various officials. See In Re Wallace, 170 F.Supp. 63 (M.D.Ala.1959); State of Alabama ex rel[.] Gallion [v. Rogers ], 187 F.Supp. 848 (M.D.Ala.1960), aff'd 85 F.2d 430 (5th Cir.), cert. denied, 366 U.S. 913, 81 S.Ct. 1085, 1086, 6 L.Ed.2d 236, 237 (1961); Kennedy v. Bruce, 98 F.2d 860 (5th Cir.196 [1962].
 
 
 260
 80. At least until 1986, racially polarized voting existed in Dallas County. See United States v. Dallas County Commission, 636 F.Supp. 704 (S.D.Ala.1986).
 
 
 261
 81. From 1901 to 1986, the form of election system for the Dallas County Commission--at large, with numbered posts--operated to dilute the voting strength of black citizens. See United States v. Dallas County Commission, 636 F.Supp. 704 (S.D.Ala.1986).
 
 
 262
 82. At present there are 68 probate judges in the State of Alabama. The four who are black are elected from black majority voting age population counties.
 
 
 263
 Done this 2nd day of December, 1991.
 
 
 264
 /s/ Richard Cohen
 
 Richard Cohen
 Elizabeth Johnson
 Attorneys for Plaintiffs
 Southern Poverty Law Center
 Montgomery, Alabama
 
 265
 [End of page 8]
 
 
 266
 /s/ David R. Boyd
 
 David R. Boyd
 One of the Attorneys for Defendants
 Balch & Bingham
 Montgomery, Alabama
 
 267
 [End of page 9]
 
 
 
 *
 Judges Dubina, Carnes and Barkett did not participate in the consideration or decision of this case
 
 
 [1]
 For ease of discussion we refer to appellants as the black voters in the ten judicial circuits under scrutiny in this case
 
 
 [2]
 Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973 (1988), provides:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 [3]
 The legislature, with the advice of the Alabama Supreme Court, has the authority to change the number and boundaries of the circuits. Ala. Const. amend. 328, Sec. 6.12
 
 
 [4]
 Court business is conducted largely at the county level. Venue is defined in terms of counties. Ala.Code Sec. 6-3-2 (1986). Each county has a courthouse, see id. Sec. 12-11-3, circuit court clerk, id. Sec. 12-17-90, and separate jury commission, id. Sec. 12-16-30
 
 
 [5]
 This is the demographic information that was presented to the district court
 CHARACTERISTICS OF CHALLENGED CIRCUITS
Circuit Total % of Black Circuit District
 Population Voting Age Judges Judges
 Population (white/black) (white/black)
 4th 106,531 49% 2/0 --
 5th 120,511 38% 3/0 --
 6th 150,522 23% 3/0 --
 7th 128,764 16% 4/0 --
 10th 651,525 32% 24/3 11/0
 13th 378,643 28% 10/1 4/1
 15th 209,085 38% 7/1 3/0
 20th 96,705 22% 3/0 --
Circuit Total % of Black Circuit District
 Population Voting Age Judges Judges
 Population (white/black) (white/black)
 23rd 238,912 19% 6/0 --
 26th 46,860 36% 2/0 2/0
----------
 
 
 [6]
 The election systems in the Seventeenth Circuit and Bullock, Greene, Lowndes, and Sumter Counties have not been directly challenged by appellants
 
 
 [7]
 The various nominating commissions came into being at different times: The Birmingham Division of the Tenth Circuit (Jefferson County) has had a nominating commission since 1951; the Twenty-Third Circuit (Madison County) has had one since 1974; the Thirteenth Circuit (Mobile County) has had one since 1982; and the Sixth Circuit (Tuscaloosa County) since 1990. See Ala. Const. amends. 83, 110, 334, 408; Ala.Acts, 90-627
 
 
 [8]
 District judges are required to have resided in their districts for at least 12 months prior to their election or appointment and must continue to reside in their district during their tenure in office. Ala.Code Sec. 12-17-64 (1986). Similarly, circuit judges are required to have resided in their circuits for at least 12 months prior to their election or appointment to office and must continue to reside in the circuit while in office. Ala. Const. art. VI, Sec. 142 (1901); Ala.Code Sec. 12-17-22 (1986)
 
 
 [9]
 The stated purpose of the ADC is to "endorse black and white candidates who will be responsive to the needs of blacks and poor people in Alabama." The majority of ADC endorsements have gone to white candidates
 
 
 [10]
 Judge Owens had alienated the black community by joining a white church, enrolling his children in a private school, supporting the white community's position in a controversial school location issue, and becoming a Republican, claiming that God had called on him to change his party affiliation
 
 
 [11]
 The record does not specify exactly what Frankie Fields Smith's bar rating was--it merely reflects that she did not receive a rating of "well qualified."
 
 
 [12]
 The record does not indicate whether Justice Adams had opposition in the 1982 general election. We assume that, having won the primary runoff, he ran unopposed
 
 
 [13]
 To provide a current depiction of the composition of the bench we have taken judicial notice of information not available at the time the district court rendered its decision. Under Rule 201 of the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
 
 
 [14]
 Appellants did not name as defendants the circuit and district judges whose offices would be affected by the injunctive relief appellants seek. Appellants' failure to name them, however, is not an issue in this appeal. Presumably, appellants sued the Attorney General, the Chief Justice, and the Secretary of State in the belief that these officers could create the new electoral system(s) such injunctive relief would mandate. The legislators, however, are the only officials who have the authority to alter the circuit boundaries in the manner appellants propose. See supra note 3
 
 
 [15]
 Appellants sought relief under the Fourteenth and Fifteenth Amendments to the United States Constitution as well as under Sec. 2 of the Voting Rights Act. The district court found no constitutional violations and dismissed appellants Fourteenth and Fifteenth Amendment claims. Appellants do not challenge the dismissal of those claims in this appeal. Accordingly, no further mention of appellants' constitutional claims will be made in this opinion
 
 
 [16]
 At the time appellants brought this suit, the question was being debated whether Sec. 2 of the Voting Rights Act applies to state judicial elections. In June 1989, the district court ruled that the Voting Rights Act does apply. SCLC v. Siegelman, 714 F.Supp. 511, 521 (M.D.Ala.1989). Shortly thereafter, the Fifth Circuit decided, in League of United Latin American Citizens Council No. 4434 v. Clements, 914 F.2d 620, 631 (5th Cir.1990) (en banc) that judicial elections are not subject to Sec. 2. Given this decision, the district court stayed the proceedings (other than discovery) in this case to allow appellees an opportunity to take an interlocutory appeal. When the Supreme Court held that state judicial elections are covered by Sec. 2, see Chisom v. Roemer, 501 U.S. 380, 403, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991); Houston Lawyers' Ass'n v. Attorney Gen., 501 U.S. 419, 424, 111 S.Ct. 2376, 2380, 115 L.Ed.2d 379 (1991) (reversing League of United Latin American Citizens ), the proceedings in the instant case resumed
 
 
 [17]
 The court, and the parties, addressed the matter of polarized voting after the facts recited in part I supra had been established. Also established was Alabama's history of discrimination against black citizens, including a legacy of disfranchisement and segregation in most areas of life. Blacks had been systematically excluded from law schools, grand and petit juries, had sat in segregated court rooms, and had been confined in segregated prisons. Statistical evidence showed that in every circuit at issue blacks have substantially lower median incomes than whites and are substantially more likely to have incomes that fall below the poverty line. Blacks have lower rates of high school and college graduation than whites and are more likely to be unemployed. Finally, racial appeals had been present in some judicial election contests; some were ineffective, however, and at least one backfired. As the district court observed:
 One ... subtle racial appeal was in the Democratic Party primary in 1982 which involved a newspaper ad run by a white candidate contrasting the pictures of the white candidate and Justice Adams. The appeal was ineffective as Justice Adams was the successful candidate. In the Twentieth [sic] Circuit (Mobile), the white candidate in the Democratic primary in the 1990 district judge race made a racial appeal intended to work against Judge Thomas, a black. The tactics in both races were condemned, and Judge Thomas credited his opponent's racial appeal with causing a backlash against the white candidate which aided his election.
 SCLC v. Evans, 785 F.Supp. at 1473.
 
 
 [18]
 Because Justice Adams was involved in three electoral contests (1982 primary, 1982 primary runoff, and 1988 general election) and there are 10 circuits being challenged, Dr. Weber counted 30 of Justice Adams' races
 
 
 [19]
 Dr. Weber defined "black preferred candidate" or "black candidate of choice" as the candidate who received more than 50% of the black vote, without reference to the candidate's race
 
 
 [20]
 Moreover, in its amicus brief to the district court, the United States acknowledged "that the institution of the at-large, numbered place system was not driven by any desire to dilute black voting strength." SCLC v. Evans, 785 F.Supp. at 1487
 
 
 [21]
 Appellants, however, do question the district court's treatment of the expert testimony. See infra pp. 1306-07
 
 
 [22]
 Incumbency is often the determining factor in judicial elections and, therefore, is an important factor to be considered in vote dilution cases in the judicial context. Likewise, the effect of the appointment process, especially where nominating commissions were involved, should not be undervalued: Over two-thirds of the sitting circuit judges (72 of 106) who came to the challenged circuit courts between 1978 and 1991 were appointed
 
 
 [23]
 We refer to the experts' opinions as arguments because that is, in essence, what they were. The experts based their opinions on undisputed statistical evidence of demographics and voting results contained in the record. The experts presented no evidence of their own; they presented only their mathematical analyses of the portions of the statistical evidence they thought to be relevant. The experts applied their ecological regression and extreme case analyses to that evidence and opined as to whether voting has been racially polarized. Their conclusions differed because of the differences in the statistical evidence they chose to evaluate
 
 
 [24]
 Appellants make it clear on appeal that they have not advocated any remedy that would lead to judges having to run against each other, such as would be the case with cumulative voting. They recognize the invidious effects that such a system would have on the collegiality of the court as well as on lawyer interest in a judicial career. Accordingly, in proposing multimember subdistricts, appellants would have the judges run for numbered places on the ballot and thus avoid the prospect of running against one another
 In passing, appellants, in their reply briefs, suggest as a possible remedy the creation of court-ordered judicial nominating commissions in jurisdictions not currently employing them, as well as increased minority representation on the commissions. This is a dubious suggestion given that appellants have alleged discriminatory practices on the part of the currently operating judicial nominating commissions: If the commissions are doing such a poor job, it is difficult to conclude that expanding their use would be beneficial. We note, additionally, that it is an open issue as to whether this type of remedy is permissible under the Voting Rights Act. The Act guarantees the right to elect representatives of choice. Judicial nominating commissions and the appointment process in general remove any choice from the voters--the initial choosing of "representatives" is no longer done by means of electoral voting procedures. Likewise, removing the power to elect judges from the citizens of Alabama would trample the longstanding value the State places on electing all of its public officials, even those officials other states have long since appointed. Today, however, we do not decide whether such a remedy is within the ambit of the Act.
 
 
 [25]
 We understand, however, that the Voting Rights Act guarantees voters the right to elect candidates of their choice, not merely the right to influence election results. See Solomon v. Liberty County, 865 F.2d 1566, 1583 (11th Cir.1988) ("Today, the goal of section 2 is not to maximize the political clout of minorities, but rather to ensure minority representation in government."), vacated and reh'g en banc granted, 873 F.2d 248 (11th Cir.1989)
 
 
 [1]
 See, e.g., United States v. Dallas County Comm'n, 850 F.2d 1433, 1440 (11th Cir.1988) ("evidence reveals[ ] a distinct pattern of racially polarized voting" in Dallas County), cert. denied, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989); United States v. Marengo County Comm'n, 731 F.2d 1546, 1567 (11th Cir.) (finding existence of racial bloc voting and stating "[r]ace is, as it has been since blacks were allowed to vote, the main issue in Marengo County politics"), cert. denied, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); Hendrix v. Joseph, 559 F.2d 1265, 1270 (5th Cir.1977) ("[V]oting in Montgomery County is polarized along racial lines...."); Nevett v. Sides, 533 F.2d 1361, 1369 (5th Cir.1976) ("There is clear evidence that there is a polarization of votes by those who do vote in the City of Fairfield on city elections."); Dillard v. Town of Louisville, 730 F.Supp. 1546, 1549 (M.D.Ala.1990) (finding "substantial racially polarized voting" in the town of Louisville); Dillard v. Town of Cuba, 708 F.Supp. 1244, 1246 (M.D.Ala.1988) ("substantial racially polarized voting" in the towns of Cuba and Waldo); Dillard v. Chilton County Bd. of Educ., 699 F.Supp. 870, 874 (M.D.Ala.1988) ("racially polarized voting in Chilton County"), aff'd, 868 F.2d 1274 (11th Cir.1989); Dillard v. Baldwin County Comm'n, 694 F.Supp. 836, 842 (M.D.Ala.) ("[T]here is extensive racial polarization in [Baldwin] County."), amended, 701 F.Supp. 808 (M.D.Ala.), aff'd, 862 F.2d 878 (11th Cir.1988); Dillard v. Crenshaw County, 649 F.Supp. 289, 295 (M.D.Ala.1986) ("[T]he evidence reflects that racially polarized voting in Calhoun, Lawrence, and Pickens Counties is severe and persistent...."), remanded on other grounds, 831 F.2d 246 (11th Cir.1987); Buskey v. Oliver, 565 F.Supp. 1473, 1482 (M.D.Ala.1983) (racially polarized voting in the city of Montgomery); Brown v. Board of School Comm'rs of Mobile County, Ala., 542 F.Supp. 1078, 1094 (S.D.Ala.1982) ("whites vote as a bloc against any black candidate" in Mobile County), aff'd, 706 F.2d 1103 (11th Cir.), aff'd, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983); Hale County, Ala. v. United States, 496 F.Supp. 1206, 1212 (D.D.C.1980) (whites engage in racial bloc voting in Hale County)
 
 
 [2]
 See, e.g., Presley v. Etowah County Comm'n, 869 F.Supp. 1555 (M.D.Ala.1994) (county commission); Dillard v. City of Greensboro, 865 F.Supp. 773 (M.D.Ala.1994) (city council); Harris v. Siegelman, 700 F.Supp. 1083 (M.D.Ala.1988) (state poll officials); United States v. Marengo County Comm'n, 643 F.Supp. 232 (S.D.Ala.1986) (county board of education), aff'd, 811 F.2d 610 (11th Cir.1987); Bolden v. City of Mobile, Ala., 542 F.Supp. 1050 (S.D.Ala.1982) (city commissioners)
 
 
 [3]
 Because these factors are derived from the Senate Report accompanying the 1982 amendments to section 2, they are known as the Senate Report factors
 
 
 [4]
 Since racially polarized voting is vital to a dilution claim, the Supreme Court, as explained earlier, has included this Senate Report factor as one of the three required preconditions. See Gingles, 478 U.S. at 48-49, 106 S.Ct. at 2765-66. Thus, the extent to which members of the minority group have been elected to public office stands as the most important Senate Report factor to consider under the totality-of-the-circumstances prong
 
 
 [5]
 It should be emphasized that this formulation of the first two Gingles factors only applies to section 2 challenges involving judicial elections
 
 
 [6]
 For example, in 1990, Alabama altered the geographical composition of the Fortieth Circuit
 
 
 [7]
 In Nipper, the entire court found that the section 2 plaintiffs had satisfied the third Gingles factor. The discussion of the third factor is located in part IV of Chief Judge Tjoflat's leading opinion, in which Judge Anderson joined. In my dissent, in which Judge Kravitch joined, I did not disagree with the Chief Judge's analysis of the third Gingles factor, and specifically noted that the court had found "that a vote dilution occurred." Nipper, 39 F.3d at 1547 (Hatchett, J., dissenting)
 
 
 [8]
 Although this holding appears in Judge Kravitch's special concurrence, all ten judges of the en banc court agreed that racially polarized voting had been established as a matter of law. See Nipper, 39 F.3d at 1537 (noting that the entire court agreed with this portion of Judge Kravitch's special concurrence)
 In Solomon, black candidates had lost six elections for county office. The determinative factor, however, was not that black candidates had lost six elections, but that they had never won one. Indeed, the fact that a minority candidate has never run for the particular office at issue "does not foreclose a vote dilution claim." Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25. "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." Westwego, 872 F.2d at 1209 n. 9; see also McMillan v. Escambia County, 748 F.2d 1037, 1045 (5th Cir.1984) ("the lack of black candidates is a likely result of a racially discriminatory system"). Thus, "[w]here a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process." Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25. As the preceding paragraph in the text illustrates, these other factors primarily include the white crossover vote in elections for any office in which both a black and white candidate competed.
 
 
 [9]
 In focusing on these elections, the district court primarily relied on the analysis of the appellees' expert, Dr. Ronald Weber. The district court should have relied on the statistical evidence concerning the white crossover vote in biracial elections, which the appellants' expert, Dr. Allan Lichtman, provided. Ironically, both of these experts also presented evidence in Nipper, where this court credited Dr. Lichtman's analysis
 
 
 [10]
 Some black candidates have won re-election contests after being appointed, but none has ever first attained office after winning a contested election
 
 
 [11]
 A copy of the parties' stipulation is attached as an appendix
 
 
 [12]
 One of the judges was appointed after the appellants filed this lawsuit
 
 
 [13]
 The chart groups circuit and district judges in the Tenth, Thirteenth, Fifteenth, and Twenty-Sixth Circuits. For example, the Tenth Circuit has twenty-four circuit judges and eleven district judges. The chart simply lists the number of judgeships as thirty-five
 Circuit % of Black % of Average Number of Number of Number of
 Voting Age White Judgeships Appointed Elected
 Population Crossover Black Black
 vote Judges Judges
 4th 49% 15% 2 0 0
 5th 38% 21% 3 0 0
 6th 23% 20% 3 0 0
 7th 16% 25% 4 0 0
 10th 32% 22% 35 3 0
 13th 28% 20% 14 2 0
 15th 38% 22% 10 1 0
 20th 22% 20% 3 0 0
 23rd 19% 22% 6 0 0
 26th 36% 16% 4 0 0
 Total -- -- 84 6 0
----------
 
 
 [14]
 Appellees, however, did contend, and the district court ultimately found, that the appellants had failed to satisfy the first Gingles factor in one circuit, the Seventh. Since the majority does not discuss this holding, I simply say that I disagree with the district court, and believe that the appellants have satisfied the first Gingles factor in the Seventh Circuit
 
 
 [15]
 These figures are based on the number of circuit court cases filed in the respective counties in 1990. This data is contained in the Alabama Judicial System Annual Report for the 1990 fiscal year (October 1, 1989, through September 30, 1990). This report is included in the record as defendant's exhibit 43
 
 
 [16]
 The following statistics are included in defendant's exhibit 76
 
 
 [17]
 These statistics are included in defendant's exhibit 43. See supra note 15
 
 
 [18]
 The following statistics are included in plaintiff's exhibits eighty-seven and eighty-eight
 
 
 [19]
 A showing of discriminatory intent is helpful in proving a section 2 claim. But, a failure to show a state's discriminatory intent does not in any way hamper a minority voter's ability to show a section 2 violation. In other words, the issue of discriminatory intent can only help, and cannot hurt, a section 2 plaintiff. Judge Edmondson is simply incorrect when he states that a failure to show discriminatory intent can, "[w]ith a single stroke, strike in favor of [the state] the balance of circumstances[,]" for the state's discriminatory intent is not required in this Senate Report factor, or in any of the other factors in the totality-of-the-circumstances prong. Put simply, the law is overwhelmingly clear that section 2 does not require minority voters to show a state's discriminatory intent in implementing its voting system
 
 
 [20]
 I have chosen to simply set out the stipulated facts. I note, however, that the appellants presented evidence that the Alabama legislature enacted Act 221, which implemented a numbered place system for electing all multimember officials, with a discriminatory intent. Appellants also presented evidence that Act 221 was meant to apply to judicial elections. The majority and Judge Edmondson may not wish to accept this evidence, but to say that the record is completely devoid of such evidence is simply not true
 
 
 [21]
 Unfortunately, it appears that these racial appeals still occur in Alabama. The 1994 Democratic primary for state auditor involved the same campaign tactic. See White, 867 F.Supp. at 1556